**CEDAR CHEMICAL CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 535–88 L.**

United States Claims Court.

Aug. 18, 1989.

Allen T. Malone, Memphis, Tenn., for plaintiff.

Susan Smith, with whom were Eileen T. McDonough, Washington, D.C., and Acting Asst. Atty. Gen. Donald A. Carr, for defendant.

## OPINION

RADER, Judge.

The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136–136y (1982 & Supp.1987), requires the Environmental Protection Agency (EPA) to indemnify owners who "suffered losses by reason of suspension or cancellation" of their pesticide registration. 7 U.S.C. § 136m(a)(3). In 1986, the EPA took action leading toward cancellation of Cedar Chemical Corporation's (Cedar or plaintiff) pesticide Dinoseb.[1] Therefore, plaintiff entered into negotiations with the EPA over the future of Dinoseb.

As a result of these negotiations, Cedar and the EPA entered into a Stipulation and Settlement Agreement (Agreement) that set forth the parties' resolution of the Dinoseb controversy. Under the Agreement, plaintiff consented to the cancellation of Dinoseb and the EPA agreed to process expeditiously Cedar's indemnification claim on its stock of unsold Dinoseb. The Agreement was contingent upon the EPA Administrator's (Administrator) entry of a final order cancelling the registration of Dinoseb.

On June 10, 1988, with plaintiff's concurrence, the EPA cancelled Dinoseb's registration. Before indemnification could occur, an association of growers and food processors (unrelated to plaintiff) filed a lawsuit challenging the cancellation order. *Northwest Food Processors Ass'n v. Reilly*, 869 F.2d 542 (9th Cir.1989). Contending that this litigation bars finality of the cancellation order, the Attorney General has not certified Cedar's claim for payment.

Plaintiff filed suit in the United States Claims Court seeking enforcement of the December 31, 1987 Agreement. This case is now before this court on plaintiff's summary judgment motion. Plaintiff requests immediate payment with prejudgment interest under the Contract Disputes Act of 1978 (CDA). 41 U.S.C. §§ 601–613 (1982 & Supp. III 1985).

After oral argument, this court denies plaintiff's motion.

## FACTS

FIFRA sets up a framework for the regulation of herbicides used in the United

---

1. Dinoseb, (2–sec–butyl–4, 6–dinitrophenol), is a contact herbicide for the control of broadleaf weeds in peanuts and potatoes.

States. Under FIFRA, a distributor must register its herbicide with the EPA before marketing the product. The EPA may suspend or cancel the registration of any unsafe chemical. Cancellation withdraws a herbicide from the market.

On October 7, 1986, the Administrator of the EPA issued an emergency order suspending the registration of Dinoseb. On October 20, 1986, Cedar and other registrants filed a timely request for an adjudicatory hearing to contest the proposed cancellation. Ten days later, Cedar withdrew its request.[2] By operation of law, the withdrawal caused the immediate and final suspension of plaintiff's product. On the same date, plaintiff and four other registrants filed a request for a hearing on final cancellation. This request led to negotiations between plaintiff and the EPA.

During pendency of the negotiations, the parties questioned the source of indemnification funds. Congress had under consideration a bill barring use of appropriated funds for indemnification. On December 22, 1987, the President signed this bill (including the indemnification funding bar) into law as Pub.L. No. 100–202. The indemnification funds bar stated:

> None of the funds in this Act shall be available for any indemnity payment under section 15 of the Federal Insecticide, Fungicide and Rodenticide Act.

Pub.L. No. 100–202, 101 Stat. 1329–199 (1987).[3]

The parties generally welcomed this action because it clarified the source of indemnification funding.[4] The source of indemnification payments would no longer be uncertain,[5] but would come from the Judgment Fund.[6] Before authorizing payment from the Judgment Fund, the Attorney General must certify that "no appeal shall be taken from a judgment or that no further review will be sought from a decision."[7] The parties to the pending Dinoseb agreement, however, did not anticipate difficulty with the payment from the Judgment Fund.

On December 31, 1987, a week after enactment of Pub.L. No. 100–202, Cedar and

---

2. In oral argument, plaintiff's attorney explained why Cedar abandoned its opposition to EPA's action against Dinoseb:

> [A]t that point—and we're now at the end of 1987—at that point it began to become obvious that we would have to go into a proceeding, a cancellation proceeding in order to have a hope of reinstating uses on products and that is a long and expensive proposition. And, as a practical matter at that point, the products had already been off the market for one year and it seemed pretty clear that it would be at least another two years before the matter could get resolved, perhaps longer, and that, together with all of the concomitant expense was not a practical way to go. So that was the reason that Cedar eventually initiated settlement discussions with EPA.

Transcript of Proceedings, No. 535–88L, filed Aug. 16, 1989, (Tr.) at 8.

3. An identical provision was included in the 1988 Appropriations Act. Pub.L. No. 100–404. Tit. II, 102 Stat. 1024 (Aug. 19, 1988).

4. Plaintiff viewed enactment of Pub.L. No. 100–202 as "good news" because it provided a "specific way ... [to] get this matter paid quickly." Tr. at 73. Counsel for EPA agreed that both parties saw Pub.L. No. 100–202 as "good news because [they] had not focused on the issue of any collateral effect" of litigation challenging the Agreement. Tr. at 75.

5. Prior to Pub.L. No. 100–202, there was great uncertainty about the source of indemnification funds. *See Lebanon Chem. Corp. v. United States,* 5 Cl.Ct. 812, 814 n. 3, *modified,* 6 Cl.Ct. 503 (1984) (the EPA was without appropriations for payments; plaintiff had to file suit before payment could be made); *Black Leaf Prod. Co. v. United States,* 4 Cl.Ct. 307 (1984). "EPA has no funds available to pay any indemnification claims, and the Agency does not expect to obtain any such funds. Accordingly, we will continue to hold these claims in abeyance pending any change in this situation." *Id.* at 308.

6. (a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when-

> (1) payment is not otherwise provided for;
> (2) payment is certified by the Comptroller General; and
> (3) the judgment, award, or settlement is payable-
> > (A) under section 2414 ... of title 28;....

31 U.S.C. § 1304 (1982).

7. "Whenever the Attorney General determines that no appeal shall be taken from a judgment or that no further review will be sought from a decision affirming the same, he shall so certify and the judgment shall be deemed final." 28 U.S.C. § 2414 (1982).

the EPA signed the Agreement. The Agreement provided that Cedar would not contest the cancellation of its product's registrations. In return, the EPA agreed to accept Cedar's stock of Dinoseb by no later than December 31, 1988. The EPA also consented to process swiftly Cedar's indemnification claim on its unsold stock.[8]

By virtue of Pub.L. No. 100–202, EPA no longer possessed funds or authority to pay indemnification claims. Instead, under 31 U.S.C. § 1304 (1982), the General Accounting Office (GAO) paid these claims from the Judgment Fund after receiving certification of finality from the Attorney General. EPA's part in this process was to certify to the Attorney General that EPA and Cedar had settled their dispute and that Cedar was entitled to indemnification. By its finding in Paragraph 13 of the Agreement, EPA fulfilled its role in the process leading to payment from the Judgment Fund. The Agreement also was contingent upon entry of the Administrator's final cancellation order.

On June 10, 1988, the Administrator issued the final order cancelling the registration of Dinoseb. Immediately after the order was issued, several growers and food processing companies, without any affiliation with plaintiff, instituted a lawsuit to block the cancellation order. These processors contended that Dinoseb was essential to the green pea, snap bean, cucurbit, and caneberry crops of the Pacific Northwest.[9] Accordingly, they challenged the Administrator's decision to cancel Dinoseb based on the Agreement. *Northwest Food Processor's Ass'n v. Thomas*, Civ.Act.No. 88–641–RE (D.Or. Oct. 5, 1988).

The Processor's Association contended that FIFRA required a full hearing before cancellation; a settlement agreement was not an adequate basis for cancellation. By challenging the adequacy of the Agreement, this litigation put enforcement of the settlement contract in doubt. In October 1988, the district court ruled that the United States Court of Appeals for the Ninth Circuit had exclusive jurisdiction under FIFRA, 7 U.S.C. § 136n, to review the cancellation order. Alternatively, the district court granted EPA's summary judgment motion and upheld the cancellation order. The Processor's Association appealed. On March 20, 1989, the Ninth Circuit issued an order upholding the validity of the cancellation order. *Northwest Food,* 869 F.2d at 542. This recent Ninth Circuit order is still subject to challenge. The Processor's Association may elect either to petition for a rehearing *en banc* or to appeal to the United States Supreme Court.

Meantime, with institution of the lawsuits challenging the cancellation order, the Attorney General could not certify that the Agreement was final. On September 9, 1988, Cedar filed this action in the United States Claims Court seeking damages for breach of the Agreement.

Plaintiff contends that the Agreement with the EPA is a valid contract. Plaintiff argues that a third party's legal challenge of the Administrator's order can only affect the cancellation order, not Cedar's contractual right to prompt indemnification under the Agreement. Therefore, Cedar seeks compensation for breach of the contract. Plaintiff also requests prejudgment interest on the damages.

Defendant contends that the Administrator's final administrative order to cancel the registration of Dinoseb is not final for purposes of payment from the Judgment Fund because of the pending litigation. Defendant notes that the Northwest Food Processors could still appeal the Ninth Circuit ruling to the Supreme Court. Defendant contends that this contingency deprives the Administrator's cancellation order of judicial finality. According to defendant, 28 U.S.C. § 2414 (1982) prevents the Attorney General from certifying and the GAO from disbursing funds to indemnify Cedar.

---

**8.** "EPA finds that Cedar is entitled to indemnification, under the criteria established by FIFRA...." Agreement, ¶ 13.

**9.** Cucurbits are members of the gourd family while caneberries include red raspberries, blackberries, boysenberries and loganberries. *Love v. Thomas,* 858 F.2d 1347 (9th Cir.1988).

## DISCUSSION

Plaintiff moves for summary judgment. The parties agree that no material facts remain in dispute. Pl. Br., filed July 10, 1989, at 2.[10] Thus, this summary judgment motion is an appropriate vehicle to decide the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In the absence of disputed facts, this court must only determine whether the moving party is entitled to a judgment as a matter of law. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988); *Beta Sys. v. United States*, 838 F.2d 1179, 1184 (Fed.Cir.1988).

### Terms of the Agreement

■ On December 31, 1987, Cedar and the EPA entered into an Agreement settling their dispute over Dinoseb. Plaintiff consented to the cancellation of the registration of Dinoseb and promised not to challenge or support any challenges to the cancellation.[11] In return, the EPA agreed to expedite Cedar's application for indemnification and to dispose of the Dinoseb by December 31, 1988.[12] This court has jurisdiction to enforce the terms of this Agreement. *Chevron Chem. Corp. v. United States*, 5 Cl.Ct. 807 (1984).

Plaintiff bases its claim to immediate indemnification on the terms of the Agreement. By the terms of the Agreement,

however, EPA does not promise to make any payments to plaintiff. Rather, EPA promises to expedite its determination that plaintiff qualifies under FIFRA for indemnification. Paragraph 13 contains EPA's most explicit promise concerning indemnification:

Based on Cedar's certifications above, EPA finds that Cedar is entitled to indemnification....

This provision does not promise payment, but declares that plaintiff qualifies under FIFRA for indemnification. This EPA finding is the first of several steps necessary to receive payment from the Judgment Fund.

Under the law governing payments from the Fund, however, the Attorney General must certify to the GAO that the Agreement is a final resolution of the claims. Title 28 of U.S.C. § 2414 requires the Attorney General to determine that "no further review will be sought from a decision" before certifying a settlement for payment. Due to the pendency of the Ninth Circuit litigation, the Attorney General cannot yet make that certification. The Processor's Association still has the option to appeal or request a rehearing of the Ninth Circuit order. In fact, until the Ninth Circuit's opinion issues, the time for the Processor's Association to exercise that option has not begun to run. In any event, the judicial

---

**10.** Defendant's answer to interrogatory No. 4: The United States admits that the pendency of these actions is the primary reason that the United States has not arranged for payment, but advises that the required approvals of payment by the U.S. Department of Justice, the General Accounting Office or the U.S. Treasury have not been made.
Pl.Br., filed May 25, 1989, Exh. B, at 5.

**11.** Paragraph 5 of the Agreement stated:
Cedar hereby consents to the entry by the Administrative Law Judge ("ALJ"), and the EPA Administrator, in *In Re Cedar Chemical Company, et. al.*, FIFRA Docket No. 590 et al., of a final cancellation order in the form appended to this Stipulation and Settlement as Attachment B. In the event that a final cancellation order in the form appended as Attachment B is entered by the ALJ and EPA Administrator, Cedar agrees that it will not seek or otherwise defend continued registration....

**12.** Paragraph 10 of the Agreement stated:
Upon entry of a final cancellation order in the form appended as Attachment B, Cedar seeks indemnification pursuant to FIFRA section 15 for the costs of certain stocks of dinoseb products....
Paragraph 13 stated:
Based on Cedar's certifications above, EPA finds that Cedar is entitled to indemnification, under the criteria established by FIFRA section 15, for the costs of the dinoseb products identified in Attachment D.
Paragraph 21 stated:
In the event that a final cancellation order is entered in the form appended as Attachment B, EPA agrees that it will accept pursuant to FIFRA section 19(a) the dinoseb products identified in Attachment D as soon as practicable, consistent with applicable legal and procurement requirements, but no later than December 31, 1988.

challenge to the Agreement and the resulting cancellation order is not final. The Attorney General cannot, within the terms of 28 U.S.C. § 2414, certify Cedar's claim for payment.

The terms of the Agreement accounted for this type of delay. Paragraph 16 of the Agreement discussed the timing of the indemnification payment:

Although the procedure set forth in paragraph 15 is intended to expedite determination of the amount of indemnification to which Cedar is entitled under FIFRA section 15, EPA makes no representations in this Stipulation and Settlement, either explicit or implicit, concerning the source or timing of any payment of such indemnification. Upon payment to Cedar of the amount of indemnification determined under paragraph 15, EPA and the United States shall be released and discharged from all claims by Cedar for indemnification....

The language of Paragraph 16 confirms that EPA had no authority to agree to pay plaintiff. EPA could only agree to set in motion immediately the process for payment from the Judgment Fund. Because this procedure was entirely new for indemnifications, however, EPA made "no representations" about the "source or timing" of payment. If EPA had authority to agree to pay plaintiff, this passage in the Agreement would not have been necessary. Under the circumstances, the parties included in their contract an understanding that EPA could not commit to a source or time for payment.

The parties were well aware of those circumstances. On December 22, 1987, Pub.L. No. 100–202 became law. On December 31, the parties executed the Agreement. Paragraph 16 reflected the parties' agreement, executed a week after enactment of Pub.L. No. 100–202, to abide by the law then governing indemnification and seek payment from the Judgment Fund. The parties mutually welcomed Pub.L. No.

100–202 as assurance of the likelihood of prompt and certain payment from the Judgment Fund.

Indeed Congress approved Pub.L. No. 100–202's indemnification provision with the Dinoseb problem in mind. The House Committee on Agriculture explained the origin and intent of Pub.L. No. 100–202's indemnification funding ban:

A third chemical, dinoseb, was suspended in October 1986. The Agency estimates that indemnification costs will exceed $40 million. To prevent dinoseb indemnification payments from draining the Agency's fiscal year 1988 pesticide budget, Congress ordered in the FY 1988 Continuing Appropriations Act (P.L. 100–202) that indemnification claims be paid from the Judgment Fund of the Treasury rather than EPA's operating budget. Conference Report 100–498, Making Further Continuing Appropriations for the Fiscal Year Ending September 30, 1988 provides that—

The conferees want to make clear that this provision is not intended to change the responsibility of the U.S. Government for indemnification. The conferees understand that claims for indemnification will continue to be submitted by claimants to EPA. The Agency should continue to conduct the technical review of such claims in an expeditious manner to determine the validity of amounts claimed. Claims will then be referred by EPA to the Department of Justice under 28 U.S.C. 2414 for settlement (or for litigation if the liability or amount are disputed by the Government) and paid pursuant to 31 U.S.C. 1304. *The conferees expect that claims which EPA deems valid should be processed routinely by the Justice Department and that approved claims should be paid promptly from the Judgment Fund of the Treasury.*[13]

---

**13.** This legislative history appeared in connection with FIFRA Amendments several months after enactment of Pub.L. No. 100–202. The 1988 Continuing Appropriations Bill contained an indemnification funding ban identical to

Pub.L. No., 100–202. Defendant referred to this House Agriculture Committee Report as an accurate summation of the intent of Pub.L. No. 100–202. Tr. at 40–41.

Federal Insecticide, Fungicide, and Rodenticide Act Amendments of 1988, H.R.Rep. No. 100–939, 100th Cong., 2d Sess. 32–33 (1988), U.S.Code Cong. & Admin.News 1988, pp. 3474, 3481, 3482 (emphasis added).

With approval of Pub.L. No. 100–202, Congress envisioned a two-step process. Congress provided this two-step process to ensure compliance with the requirements of 24 U.S.C. § 2414. First, EPA must review indemnification claims for validity. This first step is the subject of Paragraph 13 of the Agreement. EPA found plaintiff eligible for indemnification under FIFRA. Under the new law, however, another step remained. Next, the Justice Department must process the claim for payment from the Judgment Fund. This processing amounts to certifying judicial finality. As the language of the Conference Report reflects, that certification in most instances is routine and prompt. When judicial challenges to the settlement are not final, however, the Justice Department processing takes on more significance.

In this context, the language of the Agreement is particularly clear. The parties agreed in Paragraph 16 to abide by the results of this two-step process even if the "source and timing" of payment remained uncertain.[14] Unfortunately, this two-step process caused unanticipated delays in payment. Nonetheless, the parties' Agreement accounted for these delays in the clear language of Paragraphs 13 and 16.

## 28 U.S.C. § 2414

■ Plaintiff now urges this court, in effect, to certify *sua sponte* that the Ninth Circuit litigation is final and that the GAO may indemnify Cedar immediately.[15] This court resolves the issue of its authority to certify Cedar's claim for payment by consulting the language of 28 U.S.C. § 2414:

Whenever the Attorney General determines that no appeal shall be taken from a judgment or that no further review will be sought from a decision affirming the same, he shall so certify and the judgment shall be deemed final. Except as otherwise provided by law, compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States ... shall be settled and paid in a manner similar to judgments in like causes. . . .

Finality under 28 U.S.C. § 2414 protects the Government from prematurely paying a claim that might later be reversed on appeal. Thus, under 28 U.S.C. § 2414, an action is not final until exhaustion of all appeal opportunities. Congress entrusts the determination of finality solely to the Attorney General. Title 28 of U.S.C.

---

**14.** During oral argument, plaintiff's counsel attempted to suggest that the changes of law in Pub.L. No. 100–202 occurred after the execution of the Agreement:

And it was not until after the agreement was entered into that it was clear, as a result of subsequent legislation, that Congress wasn't interested in EPA using its budgetary funds for payment of these claims; but, in fact, indicated that the Judgment Fund was there for that purpose. . . .

Tr. at 14–15. Apparently plaintiff's counsel attempted to urge this court to focus on the 1988 FIFRA amendments which permanently enacted the policies earlier changed by Pub.L. No. 100–202, an appropriation bill for a single year. Tr. at 63–65. Later in the oral argument, the enactment of Pub.L. No. 100–202, in advance of execution of the Agreement, became clear. Tr. at 67–69. In response, plaintiff's counsel acknowledged learning of enactment of Pub.L. No. 100–202 prior to entering the Agreement. He viewed the enactment at the time as "good

news." Tr. at 73. He clarified, however, that the parties did not discuss the implications of the enactment. *Id.* Further argument verified that both parties knew of the enactment of Pub.L. No. 100–202, but neither party focused on the full implications of payment from the Judgment Fund. Tr. at 74–75.

**15.** The Court: Are you going to suggest that this court should substitute his judgment for that of the Attorney General?

[Plaintiff's counsel]: Yes, Your Honor. I think that this Court must construe the contract between the parties and in construing it, if this Court determines that that is a final settlement, then that will be the judgment. . . . Tr. at 62.

[Plaintiff's counsel]: [I]f it goes to litigation, of which is where we are today, then it seems to me it's up to the Court to make the determination and that's what we're asking the Court to do; And I don't think that determination requires a prior finding by the Attorney General. Tr. at 73–74.

§ 2414 grants this court no authority to perform a function committed by law to (and exclusively to) the Attorney General.

Plaintiff further contends that it loses the benefit of its bargain for prompt payment if this court fails to enforce its claim immediately. Plaintiff, however, did not bargain for prompt payment, but rather, prompt processing by EPA. EPA processed plaintiff's claim promptly as promised. According to the terms of the bargain, the parties agreed that payment might not be prompt due to operation of the new Judgment Fund procedures. Paragraph 16 memorialized this understanding. In sum, the written terms of the Agreement and the provisions of 28 U.S.C. § 2414 operate to defeat plaintiff's claim.

### Interest

■ Plaintiff also seeks interest on the indemnification due,[16] pursuant to the Contract Disputes Act of 1978(CDA), 41 U.S.C. §§ 601–613. Section 602(a) provides:

[T]his Act applies to any express or implied contract ... entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or,

(4) the disposal of personal property.

The Agreement was not a procurement contract. *See Chevron,* 5 Cl.Ct. at 810 (1984); *Lebanon Chem. Corp. v. United States,* 5 Cl.Ct. 812, 815, *modified,* 6 Cl.Ct. 503 (1984). The Agreement is not a contract for the disposal of personal property as defined by the CDA. The Agreement provides that the Government would dispose of Cedar's property. However, the disposal of personal property clause in the CDA refers to the Government disposing of property that it owns. *Toyo Menka Kaisha, Ltd. v. United States,* 220 Ct.Cl. 210, 597 F.2d 1371 (1979).

Furthermore, a contract can fall under the purview of the CDA only when the Government receives a service, not when it contracts to render a service, like disposing of herbicides. *Rider v. United States,* 7 Cl.Ct. 770, 775 (1985), *aff'd,* 790 F.2d 91 (Fed.Cir.1986); *American President Lines v. United States,* 10 Cl. Ct. 1, 16 (1986) *modified,* 821 F.2d 1571 (Fed.Cir.1987). Plaintiff erred in reading the terms "disposal of personal property," as found in 41 U.S.C. § 602(a)(4), to refer to the Government's disposal of property belonging to private parties.

Plaintiff contends that equity and 41 U.S.C. § 611 require payment of interest on its claim. Plaintiff overlooks the clear mandate of previous judicial decisions. This court may not imply an intent by Congress to permit the recovery of interest. *Zumerling v. Marsh,* 783 F.2d 1032, 1034 (Fed.Cir.1986) (quoting *Fidelity Constr. Co. v. United States,* 700 F.2d 1379, 1383 (Fed.Cir.) *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 103 (1983)). This court therefore finds that the Agreement did not fall under the purview of the CDA.

Because the Agreement does not fall under the CDA, interest is not available. In the absence of express Congressional consent to award interest separate from a general waiver of immunity to suit, the United States is immune to suit for interest. *Library of Congress v. Shaw,* 478 U.S. 310, 316, 106 S.Ct. 2957, 2962, 92 L.Ed.2d 250 (1986). In the instant case, "[t]here is no contract, treaty, or Act of Congress that ... provides for the payment of interest...." *Rogers v. United States,* 877 F.2d 1550, 1556 (Fed.Cir.1989), therefore interest cannot be awarded.

### CONCLUSION

The terms of the parties' Agreement govern. EPA agreed to process, not pay, Cedar's claim promptly and explicitly made no representation about the source or tim-

---

**16.** Although not payable immediately due to the pending Ninth Circuit litigation, plaintiff remains eligible for payment in the future.

ing of payment. Plaintiff agreed to those terms.

The parties to the Agreement consented also to abide by recent changes in the law governing indemnification. Pub.L. No. 100–202 denied EPA any authority to pay Cedar, rather payment had to come from the Judgment Fund. The parties agreed to seek indemnification from the Fund. The Attorney General may not certify a claim for payment from the Fund until all judicial challenges to the claim are final. In this case, challenges to Cedar's claim are still pending in the Ninth Circuit.

This court denies plaintiff's summary judgment motion.