**OROVILLE–TONASKET IRRIGATION DISTRICT, a State of Washington irrigation district, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 94–779C.**

United States Court of Federal Claims.

March 14, 1995.

Todd M. Nelson, Seattle, WA, for plaintiff.

Ross D. Cooper, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, for defendant. Kathleen Marion Carr, Field Solicitor's Office, U.S. Dept. of Interior, of counsel.

## OPINION

MEROW, Judge.

In this litigation Oroville–Tonasket Irrigation District (OTID), an entity organized under the laws of the State of Washington, seeks substantial sums from the United States stemming from its obligations under the November 28, 1979 Repayment Contract No. 0–07–10–W0242 with the Department of the Interior to operate and maintain the Oroville–Tonasket unit of the Chief Joseph Dam project, Washington. OTID seeks to recover: $31,530,000 in overrun operation and maintenance costs; $13,291,000 for remedial construction work; $85,000 for costs of removing and repairing ruptured reinforced plastic mortar (RPM) pipe; $37,875 for the cost of removing hazardous flume and canal; $12,900,000 to cover obligations to the United States or a declaratory judgment of nonliability therefore; and, $42,332 for a consultant's study.

This matter comes before the court on defendant's motion, filed February 24, 1995, for an enlargement of time to respond to discovery and plaintiff's motion, filed February 27, 1995, for an enlargement of time to file its initial pretrial submission. Also, submissions filed by each party on February 15, 1995 concerning the application of the Contract Disputes Act (CDA), 41 U.S.C. § 601 *et seq.*, to the contract at issue have been considered.

### *FACTS*

The pleadings and CDA submissions of February 15, 1995 disclose the following undisputed facts.

By the Act of October 9, 1962, (76 Stat. 761) Congress authorized the Secretary of the Interior to construct, operate and maintain the Oroville–Tonasket unit of the Okanogan–Similkameen division, Chief Joseph Dam project, Washington. The Act also provided that the repayment period for OTID to reimburse Interior for a portion of the project construction costs, as required by the Federal reclamation laws, 43 U.S.C. § 485h, may be enlarged to fifty years. The Act provided as follows (in part):

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purpose of furnishing a new and a supplemental water supply for the irrigation of approximately eight thousand four hundred and fifty acres of land in Okanogan County, Washington, for the purpose of undertaking the rehabilitation and betterment of existing works serving a major portion of these lands and for conservation and development of fish and wildlife resources, the Secretary of Interior is authorized to construct, operate, and maintain the Oroville–Tonasket unit of the Okanogan–Similkameen division of the Chief Joseph Dam project, in accordance with the provisions of the Federal reclamation laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto). The principal works of the unit shall consist of: facilities to permit enlargement and utilization of Palmer Lake storage; related canal, diversion dam, pumping plants, and distribution systems; and necessary works incidental to the rehabilitation of the existing irrigation system.

Sec. 2. The basic period provided in subsection (d), section 9, of the Reclamation Project Act of 1939, as amended (43 U.S.C. 485h), for repayment of the construction cost properly chargeable to any block of lands may be extended to fifty years, exclusive of any development period, from the time water is first delivered to that block. Power and energy required for irrigation pumping for the Oroville–Tonasket unit shall be made available by the Secretary from the Chief Joseph Dam powerplant and other Federal plants inter-connected therewith at rates not to exceed the cost of such power and energy from the Chief Joseph Dam taking into account all costs of the dam, reservoir, and powerplant which are determined by the Secretary under the provisions of the Federal reclamation laws to be properly allocable to such irrigation pumping power and energy.

By the Act of September 28, 1976 (90 Stat. 1325), the general plan of the Oroville–Tonasket unit authorized and constructed under the Act of October 9, 1962, quoted above, was modified to provide for construction, rehabilitation, or enlargement of facilities, land drainage, and to provide fish passage and propagation in the Similkameen River. The Act provided (in part) as follows:

Sec. 201. For purposes of supplying water to approximately ten thousand acres of land and for enhancement of the fish resource of the Similkameen, Okanogan, and Columbia Rivers and the Pacific Ocean, the Secretary of the Interior (hereinafter referred to as the "Secretary") is authorized to construct, operate, and maintain the Oroville–Tonasket unit extension, Okanogan–Similkameen division, Chief Joseph Dam project, Washington, in accordance with the Federal reclamation laws (Act of June 17, 1902, 32 Stat. 388, and Acts amendatory thereof or supplementary thereto). The principal works of the Oroville–Tonasket unit extension (hereinafter referred to as the project) shall consist of pumping plants, distribution systems; necessary works incidental to the rehabilitation or enlargement of portions of the existing irrigation system to be incorporated in the project; drainage works; and measures necessary to provide fish passage and propagation in the Similkameen River. Irrigation works constructed and rehabilitated by the United States under the Act of October 9, 1962 (76 Stat. 761) and which are not required as a part of the project shall be dismantled and removed with funds appropriated hereunder and title to the lands and right-of-way thereto which were conveyed to the United States shall be reconveyed to the Oroville–Tonasket Irrigation District. All other irrigation

works which are a part of the Oroville–Tonasket Irrigation District's existing system and which are not required as a part of the project or that do not have potential as rearing areas for fish shall be dismantled and removed with funds appropriated hereunder.

Sec. 202. The Secretary is authorized to terminate the contract of December 26, 1964, between the United States and the Oroville–Tonasket Irrigation District and to execute new contracts for the payment of project costs, including the then unpaid obligation under the December 26, 1964, contract. Such contracts shall be entered into pursuant to section 9 of the Act of August 4, 1939 (53 Stat. 1187). The term of such contract shall be fifty years, exclusive of any development period authorized by law. The contracts for irrigation water may provide for the assessment of an account charge for each identifiable ownership receiving water from the project. Such charge, together with the acreage or acre-foot charge, shall not exceed the repayment capacity of commercial family-size farm enterprises as determined on the basis of studies by the Secretary. Project construction costs covered by contracts entered into pursuant to section 9(d) of the Act of August 4, 1939, as determined by the Secretary, and which are beyond the ability of the irrigators to repay shall be charged to and returned to the reclamation fund in accordance with the provisions of section 2 of the Act of June 14, 1966 (80 Stat. 200), as amended by section 6 of the Act of September 7, 1966 (80 Stat. 707). The aforesaid contract shall provide that irrigation costs properly assignable to privately owned recreational lands shall be repaid in full within fifty years with interest.

Sec. 203. Power and energy required for irrigation water pumping for the project, including existing irrigation works retained as a part of the project, shall be made available by the Secretary from the Federal Columbia River power system at charges determined by him.

On September 28, 1979, pursuant to the authority of the Act of September 28, 1976,

quoted above, the Department of Interior and OTID entered into Repayment Contract No. 0–07–10–W0242 which provided for the United States to construct the relevant works for the Oroville–Tonasket unit consisting of: pumping plants and discharge lines for pumping water into the distribution system; relift pumping plants and booster plants as required to deliver water to the project acres; a distribution system of corrosion-resistant pipe; drainage works; power transmission lines, switchyards and substations for pumping plants; turnouts from the distribution system; wildlife mitigation facilities; and required dismantling and removal work. Essentially, the contract authorized the Secretary of the Interior to convert the existing gravity flow water delivery system consisting of canals and wooden flumes to a modern buried pipeline system providing irrigation to 10,000 acres in this apple producing region of Washington state.

Contract No. 0–07–10–W0242 also incorporates provisions requiring OTID to repay a portion of the cost incurred by the Secretary of the Interior in constructing the project and to pay for electric power furnished to OTID. As to the operation and maintenance of the project, Contract No. 0–07–10–W0242 provides as follows:

### *Operation and Maintenance of Project Irrigation Works*

18. (a) During the construction of the Project Irrigation Works, the District will continue to operate and maintain the portions of its existing irrigation system not directly involved at the time in the construction of such works. Upon substantial completion of any portion of the Project Irrigation Works as determined by the Secretary after consultation with the District, and after receipt of notice to do so, the District will assume control of and will operate and maintain such works at its expense. On substantial completion of the Project Irrigation Works as determined by the Secretary after consultation with the District, or on termination of the work thereon, after receipt of proper notice, the District will operate and maintain the entire Project irrigation system without ex-

pense to the United States. The District shall be responsible for approving the installation of new turnouts following completion of construction.

(b) The District shall promptly make any and all repairs to the Project Irrigation Works being operated by it which are necessary for proper care, operation, and maintenance. In case of neglect or failure of the District to make such repairs within 60 days following written notification, the Contracting Officer may cause the repairs to be made, and the cost thereof shall be paid by the District as prescribed by the Contracting Officer.

(c) No substantial change shall be made by the District in any of the major Project Irrigation Works without first obtaining the written consent of the Contracting Officer.

(d) The District shall hold the United States, its officers, agents, and employees harmless as to any and all damages which may in any manner grow out of the care, operation, and maintenance of any of the Project Irrigation Works.

(e) In the event the District is found to be operating the Project Irrigation Works or any part thereof in violation of this contract, then at the election of the Contracting Officer the United States may take over from the District the care, operation, and maintenance of such Project Irrigation Works by giving written notice to the District of such election and of the effective date thereof. Thereafter, during the period of operation by the United States, the District shall pay to the United States annually in advance the cost of operation and maintenance of such works as prescribed in notices from the Contracting Officer to the District. Following written notification from the Contracting Officer, the care, operation, and maintenance of such works shall be transferred to the District.

(f) In addition to all other payments to be made by the District under this contract, the District shall pay to the United States following the receipt of a detailed statement, the costs incurred by the Unit-

ed States for work involved in the administration and supervision of this contract.

As is required by 43 U.S.C. § 498, Contract No. 0–07–10–W0242 incorporates as a part of its Clause No. 24 that, "[T]itle to all works constructed under this contract, together with the lands and interests specifically needed therefor, shall be in and remain in the name of the United States until otherwise provided by the Congress."

Plaintiff asserts that, commencing in March of 1991, representatives of the United States Bureau of Reclamation (Bureau) asserted that the project covered by Contract No. 0–07–10–W0242 was "substantially complete" and began to make assessments against OTID under the Repayment Contract. OTID disputed that the project was substantially complete and refused to pay assessments. Without submitting any claim to the Contracting Officer on Contract No. 0–07–10–W0242, the instant suit was filed.

As noted previously, plaintiff's complaint pleads entitlement to substantial sums asserted to be required to carry out its contractual operating and maintenance obligation for the project. These costs are alleged to stem from the failure of the Bureau to develop and construct a system that can be operated and maintained within the repayment obligation established by congressional authorization. Sums are sought by plaintiff to cover repairs asserted to be needed and other items of required operation and maintenance activity.

Without pleading the existence of a Contracting Officer's decision asserting any claim against OTID, on February 15, 1995, defendant filed a counterclaim containing two counts. In Count I, defendant pleads that it notified OTID on October 18, 1990 that the work to be performed by defendant under Contract No. 0–07–10–W0242 was substantially completed and that plaintiff's first payment, pursuant to its prepayment obligation, was due on June/15, 1991. Judgment is sought against OTID for $1,247,579.23, plus penalty and interest, for accrued unpaid amounts. In Count II, defendant pleads entitlement to $197,461.69, representing the asserted remaining unpaid construction charge owed by OTID for defendant's work under the basic project Contract No. 14–06–100–

4442, dated December 26, 1964, as authorized by the Act of October 9, 1962 quoted above.

A Pretrial Order was filed on January 31, 1995, requiring, among other items, initial submissions by OTID identifying its proposed exhibits, witnesses, and book and record entries to be used in support of claimed amounts. Also, as the pleadings did not indicate compliance with the provisions of the CDA, 41 U.S.C. § 601 *et seq.*, counsel were requested to file statements as to the applicability of this legislation to the contract(s) at issue.

In statements, filed February 15, 1995, both parties have asserted that the CDA does not apply to the contract(s) at issue although defendant asserted its right to change its position at any stage in the litigation. By an unopposed motion, filed February 27, 1995, OTID seeks an enlargement of one year in the time set forth in the Pretrial Order, filed January 31, 1995, for its initial pretrial submission. In support of its motion OTID states that:

> The parties require an enlargement of time because this is a complex case which will likely involve the discovery and review of thousands of pages of documents located in the states of Washington, Idaho, Colorado, and in other places where the defendant maintains records pertaining to this project. This case will also entail the depositions of a very substantial number of witnesses who participated in designing, developing, negotiating, planning and constructing a project valued at nearly $100 million. Several of these witnesses may be difficult to locate because they have retired and/or moved to other jobs. An enlargement of time may also promote settlement by allowing the parties to negotiate before being pressed to complete all pretrial discovery.

### DISCUSSION

█ Plaintiff has not submitted its pleaded claims to the Contracting Officer on Contract No. 0–07–10–W0242 for a decision(s). Defendant does not have a Contracting Officer's decision(s) on which to premise its pleaded counterclaims. If the CDA is applicable to Contract No. 0–07–10–W0242, Contracting Officer decisions are a jurisdictional prerequisite to litigation in this court. *Sharman Co., Inc. v. United States,* 2 F.3d 1564, 1568 (Fed. Cir.1993); *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 645 F.2d 966 (1981); *Joseph Morton Co., Inc. v. United States,* 757 F.2d 1273, 1279 (Fed.Cir.1985).

Thus, before proceeding with this complex litigation, it is necessary to resolve the issue raised *sua sponte* as to the applicability of the CDA to Contract No. 0–07–10–W0242. *Hambsch v. United States,* 857 F.2d 763, 764 (Fed.Cir.1988), *cert. denied,* 490 U.S. 1054, 109 S.Ct. 1969, 104 L.Ed.2d 437 (1989). ("Nevertheless, we must determine jurisdiction for ourselves and, accordingly, raise the issue *sua sponte.*")

### A. The Traditional Contract Disputes Procedure

There is a long tradition in federal government contracting of requiring the submission of claims to the Contracting Officer before there can be resort to litigation. From an early date this was accomplished by the insertion of a disputes clause in government contracts. Anderson, *The Disputes Article in Government Contracts,* 44 Mich.L.Rev. 211 (1945); *Kihlberg v. United States,* 97 U.S. 398, 401, 24 L.Ed. 1106 (1878). Enforcing the disputes clause procedure, the Supreme Court ruled:

> But article 15 [the disputes clause] is something more than a dead letter to be reviewed only at the convenience or discretion of the contractor. It is a clear, unambiguous provision applicable at all times and binding on all the parties to the contract. No court is justified in disregarding its letter or spirit.
>
> ... It creates a mechanism whereby adjustments may be made and errors corrected on an administrative level, thereby permitting the Government to mitigate or avoid large damage claims that might otherwise be created.

*United States v. Holpuch Co.,* 328 U.S. 234, 239, 66 S.Ct. 1000, 1003, 90 L.Ed. 1192 (1946). *See also United States v. Moorman,* 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256

(1950); *United States v. Wunderlich,* 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113 (1951).

Dissatisfaction with the almost complete administrative finality afforded to disputes clause decisions following the ruling in *United States v. Wunderlich, supra,* led to the enactment of the Wunderlich Act, 41 U.S.C. § 321–322. This Act restored judicial review but was construed to require full exhaustion of appellate administrative disputes clause remedies before litigation could be initiated, except for claims where there was no relief available under a term of the contract. *United States v. Carlo Bianchi & Co. Inc.,* 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963); *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *United States v. Anthony Grace & Sons, Inc.,* 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

Following an extensive examination, in 1972 the Commission on Government Procurement submitted a Report containing a number of recommendations with respect to improving government procurement. The Report consisted of Parts A–J in four substantial volumes. It set forth recommendations on such matters as the authorization of sole-source procurement in circumstances where competition was not feasible. Report of the Commission on Government Procurement, Vol. 1, Part A, Recommendation 6, p. 26. Part G of the Report concerned "[L]egal and Administrative Remedies" and encompassed several recommendations such as:

> Recommendation 5. Empower contracting agencies to settle and pay, and administrative forums to decide, all claims or disputes arising under or growing out of or in connection with the administration or performance of contracts entered into by the United States.

> \*　\*　\*　\*　\*　\*

Recommendation 6. Allow contractors direct access to the Court of Claims and district courts.

Report of the Commission on Government Procurement, Vol. 4, Part G, pp. 22–23.

With respect to its Part G Recommendation No. 6, the Commission explained that it "... would allow contractors, at their option, to bypass administrative disputes-resolving forums and seek review of adverse contracting officer decisions directly in either the Court of Claims or in a U.S. district court." *Ibid.*

Following extensive congressional consideration, Public Law 95–563, 92 Stat. 2383, the Contract Disputes Act of 1978, was enacted on November 1, 1978 and codified as 41 U.S.C. § 601 *et seq.* The CDA implemented, in part, several of the recommendations set forth in Part G of the Report of the Commission on government procurement. For contracts covered by the Act, all claims by a contractor against the government had to be submitted to the Contracting Officer for a decision, and all government claims against the contractor were required to be the subject of a decision by the Contracting Officer. 41 U.S.C. § 605(a). Following a Contracting Officer's decision, at the option of the contractor, the CDA provided that the decision can be appealed to an agency board of contract appeals or, alternatively, a direct access suit can be initiated in the Court of Claims (United States Court of Federal Claims). 41 U.S.C. § 606, 609(a)(1). The Commission on Government Procurement's recommendation for district court access was rejected. Instead, Section 14(a) of the CDA, 92 Stat. 2389, amended 28 U.S.C. § 1346(a) to rescind district court jurisdiction over contract claims subject to the CDA.[1]

With the enactment of the CDA, the administrative disputes resolution process was no longer premised on the existence of a "disputes clause" in the contract, but the Act

---

**1.** S.Rep. No. 95–1118, 95th Cong., 2d Sess. 10, *reprinted in* 1978 U.S. Code Cong. & Admin.News, 5235, 5244 explains this repeal of district court jurisdiction as follows:

> Section 10(a) [of the CDA] is amended by allowing contractors with suits against the Government ... to bring direct action only in the Court of Claims. U[nited] S[tates] district

court jurisdiction is eliminated from Government contract claims. The committees believe that only one court jurisdiction is needed to handle direct actions and that court should be the Court of Claims which historically has been the court of greatest expertise in Government contract claims.... This obviates the need for localized district courts to hear cases.

still permitted an agency to include a contract clause providing that, pending a final decision on an appeal, action, or final settlement, a contractor was required to proceed with the performance of the contract in accordance with the Contracting Officer's decision. 41 U.S.C. § 605(b).

■ Accordingly, it can be seen that one constant which has been retained throughout the various changes which have occurred over the years in the disputes resolution process for government contracts is the submission of a contractor's claim to the Contracting Officer prior to the initiation of litigation. For contracts covered by the CDA, Congress placed additional significance on the submission of a claim to the Contracting Officer by adding a certification requirement. 41 U.S.C. § 605(c)(1). This was intended to discourage the submission of unwarranted contractor claims and to encourage settlements. *Paul E. Lehman, Inc. v. United States*, 230 Ct.Cl. 11, 14, 673 F.2d 352, 354 (1982).[2]

### B. *CDA Applicability*

Section 3 of the CDA provides as follow (in part):

§ 602 Applicability of law

(a) Executive agency contracts

Unless otherwise specifically provided herein, this chapter applies to any express or implied contract ... entered into by an executive agency for—

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or,

(4) the disposal of personal property. 41 U.S.C. § 602(a).

It has been ruled that the CDA is not applicable to all government contracts. *G.E. Boggs & Associates, Inc. v. Roskens*, 969 F.2d 1023, 1026 (Fed.Cir.1992).

■ Contracts not awarded by an executive agency, are not covered by the CDA. *Tatelbaum v. United States*, 749 F.2d 729, 730 (Fed.Cir.1984). The Department of the Interior is an executive agency. 43 U.S.C. § 1451.

■ Contract No. 0–07–10–W0242 was executed after the effective date of the CDA so that a coverage election by OTID is not required. *See Joseph Morton Co., Inc. v. United States*, 757 F.2d 1273, 1279 (Fed.Cir. 1985).

■ Both parties assert that Contract No. 0–07–10–W0242 does not provide for the procurement of property, other than real property in being. A "procurement" is an acquisition by purchase, lease, or barter, of property or services for the direct benefit or use of the federal government. *Bonneville Associates v. United States*, 43 F.3d 649, 653 (Fed.Cir.1994). An examination of Contract No. 0–07–10–W0242 does not disclose any term which comprises a procurement of property by the United States.

■ The parties also assert that Contract No. 0–07–10–W0242 does not involve the procurement of services. In its statement, filed February 15, 1995, OTID states that, "[C]ertainly, the Bureau is not purchasing any service from OTID, ...." However, as quoted above, the Acts of October 9, 1962 and September 28, 1976, authorized the Secretary of the Interior to construct, operate and maintain the project unit in question to supply irrigation. As required by 43 U.S.C. § 498, Contract No. 0–07–10–W0242 provides

---

**2.** The requirement for an initial administrative claim submission so that a government agency has the opportunity to correct errors and resolve disputes to avoid costly and time consuming litigation is also applicable in another major area of Court of Federal Claims jurisdiction—tax refund matters. 26 U.S.C. § 7422(a); *Disabled American Veterans v. United States*, 227 Ct.Cl. 474, 650 F.2d 1178 (1981). These procedures are in accord with the general rule of long standing that, to promote judicial efficiency, parties must exhaust prescribed administrative remedies before seeking relief from a federal court. *See Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, and n. 9, 58 S.Ct. 459, 463–464, and n. 9, 82 L.Ed. 638 (1938); *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

that ownership of the project is retained by the United States. This contract also requires that the works after construction by the government, be operated and maintained by OTID at OTID's expense. OTID is thus required by Contract No. 0–07–10–W0242 to carry out the obligation placed by Congress on the Secretary of the Interior to operate and maintain the project in question. If OTID does not make all repairs to the works necessary for proper care, operation and maintenance, Contract No. 0–07–10–W0242 (clause 18(b)) provides that the Contracting Officer may cause the repairs to be made with the cost to be paid by OTID. Clearly by the contract in question, the government has procured the services of OTID to operate and maintain a government-owned facility. This is a procurement of services. In fact, regulations implementing the Service Contract Act of 1965, 41 U.S.C. § 351–357, list typical "services" for which the government contracts, including, "[O]peration, maintenance or logistic support of a Federal facility." 29 C.F.R. § 4.130(a)(38). *See Menlo Service Corp. v. United States,* 765 F.2d 805, 808 (9th Cir.1985).

Plaintiff's claims pleaded in this matter directly relate to its obligation under Contract No. 0–07–10–W0242 to operate and maintain the government-owned project. OTID seeks to recover repair costs and a substantial overrun in its costs to perform the operation and maintenance service required by the contract.

■ Both parties assert that Contract No. 0–07–10–W0242 does not involve the procurement of construction, alteration, repair or maintenance of real property. However, the contract (clause 18(a)) does require OTID to maintain and repair a government-owned facility. Plaintiff's pleaded claims all relate to its contractual obligation to operate, maintain and repair the government-owned facility.

■ Both parties assert that Contract No. 0–07–10–W0242 does not involve the disposal of personal property. Unless the government's obligation under the contract to sell electric power to OTID for the operation of the works constitutes a disposal of personal property, a matter not briefed, the contract

does not otherwise provide for such disposal of personal property by the government.

Accordingly, it is concluded that Contract No. 0–07–10–W0242 does constitute a contract entered into by an executive agency for the procurement of services and for the procurement of the repair or maintenance of real property. As such, the contract fits within the categories set forth in 41 U.S.C. § 602(a). *Bonneville Associates v. United States, supra.* However, OTID asserts that the United States Court of Appeals for the Federal Circuit has ruled that certain contracts, arguably within the categories listed in 41 U.S.C. § 602(a), are not covered by the CDA, when the purpose for the Act is considered. Plaintiff argues that Contract No. 0–07–10–W0242 is similar to the contracts ruled not covered by the CDA in: *G.E. Boggs & Associates, Inc. v. Roskens, supra; New Era Constr. v. United States,* 890 F.2d 1152 (Fed. Cir.1989); and *Pasteur v. United States,* 814 F.2d 624 (Fed.Cir.1987).

Contract No. 0–07–10–W0242 bears no similarity to the contract between G.E. Boggs & Associates, Inc., and the Government of the Syrian Arab Republic which was adopted by the United States for termination purposes pursuant to legislative authorization. *G.E. Boggs & Associates, Inc. v. Roskens,* 969 F.2d at 1027. The contract involved in the instant litigation required the government to expend substantial appropriated funds and provides that plaintiff operate and maintain the resulting government-owned facility for many years.

In *New Era Constr. v. United States, supra,* CDA coverage was denied because there existed no direct contractual relationship between the government and the contractor. In the instant case a direct contractual relationship exists.

In *Pasteur v. United States, supra,* which involved a transfer of virus samples from the Institute Pasteur to the National Cancer Institute, the court ruled that the transaction "... was closer to being donative in nature than it was to the contracts for procurement of property or services which Congress contemplated including within the scope of the Contract Disputes Act." 814 F.2d at 628. The absence of competition in the virus

transfer transaction also was a factor in the court's ruling. 814 F.2d at 627. In this regard, the court cited the legislation establishing the Commission on Government Procurement which was created by Congress to submit recommendations concerning the acquisition of goods, services and facilities "... of the requisite quality and within the time needed at the lowest reasonable cost, utilizing competitive bidding to the maximum extent practicable...." 814 F.2d at 627 (quoting Pub.L. No. 91–129, § 1, 83 Stat. 269, as amended by Pub.L. No. 92–47, 85 Stat. 102).

As noted previously, the part of the Report of the Commission on Government Procurement which was implemented by the CDA (Recommendations Nos. 5–7, 9, 11, 12 of Part G, Vol. 4), was not concerned with the competitive or noncompetitive process of contract awards. Rather, Part G of the Report addressed a uniform procedure for resolving disputes arising under government contracts, however awarded. Recommendations in Part A, Vol. 1 of the Report of the Commission on Government Procurement concerning competition in awarding contracts do not concern the disputes resolution process for matters arising after award. Report of the Commission on Government Procurement, Vol 1, Appendix H (List of Recommendations—Parts A–J).

■ Accordingly, while it is certainly logical that "[T]he way potential contractors view the disputes—resolving system influences how, whatever, and at what prices they compete for Government contract business," this does not support a conclusion that Congress did not intend the CDA to be applicable to all contracts within the categories set forth in 41 U.S.C. § 602(a).[3] *See Pasteur, supra,* 814 F.2d at 627 (citing S.Rep. No. 1118, 95th Cong.2d Sess. (1978), *reprinted in*

1978 U.S.Code Cong. & Admin.News, 5235, 5238).

■ The procurement regulations provide authority for the award of contracts where there is other than full and open competition (48 C.F.R. § 6.300) and set forth no indication that this is a factor with respect to CDA coverage. Circumstances exist where there is only one logical source to supply a product or service to the government, and the CDA is still applicable if a contract is awarded to such a source. *See City of Tacoma, Department of Public Utilities v. United States,* 31 F.3d 1130 (Fed.Cir.1994).

In any event, Contract No. 0–07–10–W0242 bears no similarity to the "donative" virus transmittal transaction involved in the *Pasteur* case. No policy reason has been cited for excluding the contract at issue from CDA coverage.

■ Absent CDA coverage, there exists no requirement for submission of OTID's claims to the Contracting Officer for a decision prior to initiating litigation. OTID indicates that a reason for its one-year time enlargement request for its initial pretrial submission, is the prospect of settlement. The CDA claim submission process together with the requirement for claim certification was intended by Congress to promote settlement. *Paul E. Lehman, Inc. v. United States, supra.* As discussed previously in Section A, there is a tradition of long standing for claims to be submitted to Contracting Officers before litigation is initiated. This promotes judicial efficiency in that the claim is substantially developed before litigation is commenced, rather than consuming extended court time in this process such as plaintiff's requested one-year time enlargement.[4] Pri-

---

**3.** For example, absent CDA coverage, a contractor can usually not recover interest on a claim. *Library of Congress v. Shaw,* 478 U.S. 310, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986); *Cedar Chemical Corp. v. United States,* 18 Cl.Ct. 25, 32 (1989). Recommendation No. 11, Part G, Vol. 4 of the Report of the Commission on Government Procurement that the government "[P]ay interest on claims awarded by administrative and judicial forums.", was implemented in Section 12 of the CDA, 41 U.S.C. § 611. A contract not subject to the CDA would thus be viewed less favorably by a contractor concerned with the disputes resolu-

tion process, because interest could not be recovered. This would be detrimental to competition. If competition in government procurement is the policy to be encouraged, an all inclusive approach with respect to CDA coverage of contracts within the categories set forth in 41 U.S.C. § 602(a) is thus more consistent with Congressional intent.

**4.** To the extent that a contractor requires government documents in order to prepare its claim for submission to the Contracting Officer, and the documents are not voluntarily produced by the

**24**

or claim submission also enables agencies and contractors to avoid litigation in the many instances where a complete presentation to the Contracting Officer will result in its resolution.

Accordingly, if CDA coverage of contracts within the categories set forth in 41 U.S.C. § 602(a) also depends upon the application of established policy considerations, these considerations firmly support application of the CDA to Contract No. 0–07–10–W0242.

## CONCLUSION

As the CDA is applicable to Contract No. 0–07–10–W0242, and it is admitted by the parties that the Contracting Officer decisions required as a jurisdictional prerequisite to a suit or counterclaim in this court have not been obtained, this litigation cannot proceed.[5] Also, as there exists no jurisdiction over plaintiff's pleaded claims, jurisdiction over the counterclaim filed by defendant falls in any event. *Somali Development Bank v. United States*, 205 Ct.Cl. 741, 752, 508 F.2d 817, 822 (1974).

Accordingly, it is **ORDERED** that final judgment be entered dismissing the com-

government, the expansive provisions of the Freedom of Information Act, 5 U.S.C. § 552, are available to compel disclosure. *See Grumman Aerospace Corp. v. United States*, 217 Ct.Cl. 285, 304, 579 F.2d 586, 595 (1978); *National Presto Industries, Inc. v. United States*, 218 Ct.Cl. 696, 1978 WL 8475 (1978).

5. Given CDA applicability to Contract No. 0–07–10–W0242, the United States Court of Federal Claims would have exclusive jurisdiction over any direct access action brought on a claim under this contract pursuant to 41 U.S.C. § 609(a)(1), after compliance with the procedures mandated by 41 U.S.C. § 605. This is because United States district courts do not have jurisdiction over contract claims against the United States exceeding $10,000, 28 U.S.C. § 1346(a)(2), and jurisdiction over CDA contract claims against the United States not exceeding $10,000 was repealed by Section 14(a) of the CDA, 92 Stat. 2389, codified in 28 U.S.C. § 1346(a)(2). Congress has waived sovereign immunity to give consent "... to join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law." 43 U.S.C. § 390uu. It is provided that, "[A]ny suit

plaint and counterclaim in this matter, without prejudice, as no claim within the jurisdiction of this court has been pleaded. No costs shall be assessed.

pursuant to this section may be brought in any United States district court in the State in which the land involved is situated." *Id.* This legislation has been held to waive sovereign immunity for suits on a reclamation law contract against the United States in a district court, when declaratory or equitable relief not comprising a CDA claim is sought. *See Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 673 (9th Cir. 1993). However, the comprehensiveness and exclusivity of the CDA and the silence of 43 U.S.C. § 390uu with respect to CDA claims, suggest that the later provision did not supplant the former. *See Cecile Industries, Inc. v. Cheney*, 995 F.2d 1052, 1056 (Fed.Cir.1993) (Subsequently enacted Debt Collection Act of 1982, 31 U.S.C. § 3716, did not supplant or restrict CDA procedures); *Sharman Co., Inc. v. United States*, 2 F.3d 1564, 1568, n.. 6 (Fed.Cir.1993); *Richland–Lexington Airport v. Atlas Properties*, 854 F.Supp. 400, 415–17 (D.So.Car.1994); *but see Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, 823 F.Supp. 715, 747 (E.D.Cal.1993) (CDA applicability not considered). In any event, in the absence of a decision(s) by the Contracting Officer on Contract No. 0–07–10–W0242, this court lacks jurisdiction to proceed with the instant litigation. *Sharman Co., Inc. v. United States, id.* at 1568; *Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 645 F.2d 966 (1981).