ARCHER, Circuit Judge.
 

 Instituí Pasteur appeals from the grant by the United States Claims Court
 
 [1]
 
 of summary judgment against it and in favor of the United States. We reverse and remand.
 

 Background
 

 In early 1983, Instituí Pasteur (Pasteur) scientists in France, led by Dr. Luc Mon-tagriier, the head of Pasteur’s viral oncology unit, isolated and identified a virus which they called Lymphadenopathy Associated Virus (LAV) and which they believed to be the cause of the disease known as Acquired Immune Deficiency Syndrome (AIDS).
 

 On September 15, 1983, Dr. Montagnier filed a patent application in the United Kingdom, Application No. 83.24.800, for a diagnostic kit which utilizes the LAV virus to detect antibodies in the blood of persons with AIDS and pre-AIDS conditions.
 
 [2]
 
 That same day he presented the results of his research at a scientific conference held at Cold Spring Harbor, New York, where Dr. Gallo and other National Cancer Institute (NCI) researchers were also present.
 

 A week later, at the request of Dr. Gallo, Pasteur sent samples of the LAV virus to Dr. Gallo for research use. Accompanying the samples was a document
 
 [3]
 
 conditioning
 
 *626
 
 acceptance of the samples by NCI on provisions prohibiting disclosure and commercial or industrial use without permission and limiting the allowable use to research purposes. The document was signed on September 23, 1983 by Dr. Mikulas Popovic, a visiting scientist working with Dr. Gallo’s group.
 

 In April 1984, Dr. Gallo announced that he had proven the cause of AIDS to be a virus which he called Human T-Cell Lym-photropic Virus, Type III (HTLV-III). NCI research personnel, including Drs. Gallo and Popovic, filed a patent application on April 23, 1984 for a diagnostic kit for AIDS which utilizes HTLV-III. This application resulted in issuance of U.S. Patent No. 4,520,113 on May 28, 1985.
 
 [4]
 
 The patent was assigned to and licensed by the Department of Health and Human Services (HHS), generating royalties to the United States government.
 

 Thereafter, a series of meetings and communications took place among high ranking personnel of Pasteur and HHS in which Pasteur asserted that the virus responsible for AIDS was discovered by the group working at Pasteur, that the Gallo, et al. patent could not be considered valid, and that the collection of royalties by the United States constituted unjust enrichment. When HHS responded that it could “find no basis to support [Pasteur’s] position,” Pasteur filed its complaint in this matter in the United States Claims Court stating that the virus described in the Gallo et al. patent “is, or is substantially identical to, the LAV strain first isolated by Pasteur ... and provided to NCI by Pasteur under promises of confidentiality and noncommer-cialization.” Pasteur alleged that the United States, in obtaining a diagnostic kit patent, negotiating license agreements and obtaining royalties, breached an express contract with Pasteur, the September 23, 1983 document signed by Dr. Popovic. The complaint also alleged breach of an implied contract, arising from the statements and conduct of the parties and the custom and practice of the scientific research community, which obligated the United States to share information concerning its research discoveries and to give appropriate recognition and acknowledgment to the work of Pasteur. As relief Pasteur sought,
 
 inter alia,
 
 an accounting of royalties and damages in excess of $1 million.
 

 The Claims Court dismissed the complaint without prejudice for lack of jurisdiction. Assuming for the purpose of its analysis the existence of a valid and binding contract, the court held that the scientific material received by Gallo was clearly “property,” but not real property in being, and that the alleged contract was squarely within the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-13 (1982) (CDA). Under the CDA, a prerequisite to Claims Court jurisdiction of claims over $50,000 is the prior presentation of a certified claim to an agency contracting officer and a decision (or a failure to decide) by that officer. Finding that Pasteur had not complied with these mandatory requirements, the Claims Court dismissed the complaint.
 

 OPINION
 

 The Claims Court did not reach the issues of contract existence, validity, enforceability or breach and on these issues we express no opinion. The sole issue before this court on appeal is whether the pleaded contracts are covered by the CDA. This involves statutory interpretation, which is a question of law on which this court must exercise its independent judgment.
 
 Minnesota Power And Light Co. v. United States,
 
 782 F.2d 167, 169 (Fed Cir.1986).
 

 Upon consideration of the language and purpose of the CDA, its legislative history and associated regulations, we conclude that the Claims Court erred in holding the CDA applicable to the pleaded contracts.
 

 
 *627
 
 In any situation involving the interpretation of a statute, “[a]nalysis must begin with the language of the statute.”
 
 United States v. John C. Grimberg Co.,
 
 702 F.2d 1362, 1365 (Fed.Cir.1983) (citing
 
 Southeastern Community College v. Davis,
 
 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979)). 41 U.S.C. § 602(a) provides (a) Executive agency contracts
 

 Unless otherwise specifically provided herein, this chapter applies to any express or implied contract ... entered into by an executive agency for—
 

 (1) the procurement of property, other than real property in being;
 

 (2) the procurement of services;
 

 (3) the procurement of construction, alteration, repair or maintenance of real property; or,
 

 (4) the disposal of personal property.
 

 Although this court has referred to the language of § 602(a) as unambiguous,
 
 Coastal Corp. v. United States,
 
 713 F.2d 728, 730 (Fed.Cir.1983), it has also stated that
 

 even where a statute is clear on a purely linguistic level, interpretation may be necessary if that interpretation does not do justice to the realities of the situation. As stated by the Supreme Court in
 
 Church of the Holy Trinity v. United States,
 
 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892), it is a “familiar rule that a thing may be within the letter of the statute, but not within its spirit nor within the intention of its makers.”
 

 Texas State Comm’n for the Blind v. United States,
 
 796 F.2d 400, 406 (Fed.Cir.1986).
 

 To determine whether the applicability of the CDA to the pleaded contracts is within the intention of Congress, we must look to the purpose of the Act and its legislative history.
 

 The CDA is an implementation of recommendations made by the Commission on Government Procurement, created by Congress in 1969, to
 

 promote economy, efficiency, and effectiveness in the procurement of goods, services and facilities by and for the executive branch of the Federal Government by—
 

 (1) establishing policies, procedures, and practices which will require the Government to acquire goods, services, and facilities of the requisite quality and within the time needed at the lowest reasonable cost, utilizing competitive bidding to the maximum extent practicable....
 

 Pub.L. No. 91-129, § 1, 83 Stat. 269, as amended by Pub.L. No. 92-47, 85 Stat. 102. As stated in the Senate Report on the CDA
 

 Both [the economy of our society and the success of many major Government programs] can be affected by the existence of competition and quality contractors— or by the lack thereof. The way potential contractors view the disputes-resolving system influences how, whether, and at what prices they compete for Government contract business.
 

 S.Rep. No. 1118, 95th Cong., 2d Sess. (1978),
 
 reprinted in
 
 1978 U.S. Code Cong. & Admin. News 5235, 5238.
 

 Such policy considerations relating to cost and competition have no application, however, to the pleaded contracts. The September 23, 1983 document merely defined the way in which NCI scientists were to deal with the LAV virus samples supplied without charge by Pasteur in the context of a collaborative research effort. In this respect the pleaded contracts resemble the implied contract at issue in
 
 Coastal,
 
 wherein this court stated that an implied contract to treat a bid honestly and fairly merely defined the way the Government must deal with bids in the process of selecting a contractor, and that it was not a contract for the procurement of goods or services under the CDA.
 

 A review of associated regulations reveals an emphasis on a buyer-seller relationship and an expenditure of government funds. For example, in 41 C.F.R. § 1-1.-208 (1983), “contract” is defined as
 

 a binding legal relation basically obligating the seller to furnish personal property or nonpersonal services (including construction) and the buyer to pay therefor. It includes all types of commitments
 
 *628
 
 which obligate the Government to an expenditure of funds____
 

 Similarly, 41 C.F.R. § 1.209 (1983) defines “procurement” as
 

 the acquisition ... from non-Federal sources, of personal property and non-personal services (including construction) by such means as purchasing, renting, leasing (including real property), contracting or bartering, but not by seizure, condemnation, donation, or requisition.
 

 Here there was no “buyer” or “seller” and no obligation on the part of the Government to expend funds. The Claims Court noted that “a cash ‘payment’ is not the applicable test” of whether a contract comes within the ambit of the CDA.
 
 See Coffey v. United States On Behalf Of The Commodity Credit Corp.,
 
 626 F.Supp. 1246, 1250 (D.Kan.1986). We are persuaded, however, that the transaction here was closer to being donative in nature than it was to the contracts for procurement of property or services which Congress contemplated including within the scope of the Contract Disputes Act.
 

 We are also not convinced that the transaction was a “barter” contract as found by the Claims Court to support its holding that the CDA was applicable. The September 23, 1983 document merely conditioned acceptance of the LAV virus samples on a promise to refrain from sharing them without permission from Pasteur. Neither that promise nor the Government’s implied promise to share the results of future.experiments with Pasteur can be considered “specific property susceptible of valuation,” as would be required for barter. Black’s Law Dictionary 1200 (5th ed. 1979).
 

 Finally, application of complex, burdensome, and inevitably time-consuming procurement regulations to the type of scientific collaboration here involved would “not do justice to the realities of the situation.”
 
 Texas State Comm’n For The Blind,
 
 796 F.2d at 406. The exchange of information and perishable biological products among scientists engaged in collaborative research relating to deadly diseases such as AIDS should not be required to await compliance with procurement regulations such as those requiring a documented determination by a contracting officer that the contractor (here, Pasteur) is “responsible,” 41 C.F.R. §§ 1-1.12, 3-1.12 (1983), or a written justification for contracting on a noncompetitive basis, 41 C.F.R. § 3-3.5301 (1983). Moreover, the numerous form clauses required by federal procurement regulations would have no applicability to this type of collaborative research effort.
 
 See, e.g.,
 
 41 C.F.R. §§ 1-1.318-7, 1-7 (1983). Confirmatory of this is the fact that HHS itself has used a form similar to Pasteur’s September 23, 1983 agreement when sending cell lines to other laboratories.
 

 For the foregoing reasons, we are persuaded that the primary function of the pleaded contracts was facilitation of the transfer of research materials among scientists engaged in a collaborative research effort, not procurement of property or services, and that they, therefore, do not fit within the scope of the Contract Disputes Act. Accordingly, we reverse the judgment of the Claims Court and remand the case for consideration of whether there is a valid and enforceable contract, and, if so, whether it has been breached.
 

 REVERSED and REMANDED.
 

 [1]
 

 .
 
 Institut Pasteur v. United States,
 
 10 Cl.Ct. 304 (1986).
 

 [2]
 

 . Montagnier, et al. filed patent application Serial No. 558,109 in the United States on December 5, 1983, citing the British application for priority.
 

 [3]
 

 . The document read:
 

 Virus LAV1 produced by human T-lymphocytes no 1-232 deposited on July 15th, 1983 at the C.N.C.M. [Collection National de Cultures de Microorganismes]
 

 The virus LAV1 will be available subject to acceptance of the three following conditions:
 

 1) The virus will be used by the recipient himself, exclusively, and only for the following research purposes (fill in):
 

 a) biological; b) immunological and c) nucleic acid studies.
 

 2) It will not be used for any industrial purpose without the prior written consent of the Director of the Pasteur Institute.
 

 3) The recipient agrees not to disseminate the virus in any form (to companies or other scientists) without the prior written authorization of the Director of the Pasteur Institute. The recipient is also informed that the virus LAV1 may constitute a potential biohazard.
 

 I AGREE TO ACCEPT two samples of virus LAV1 (Mkt-1B and JBB LAV) and anti-interferon sheep serum (2ml) UNDER THE CONDITIONS LISTED ABOVE.
 

 DATE September 23, 1983
 

 NAME Dr. Mikulas Popovic SIGNATURE Mikulas Pop-ovic
 
 /%/
 

 
 *626
 
 (Underlining indicates handwriting.)
 

 [4]
 

 . An interference proceeding is pending in the U.S. Patent and Trademark Office, pursuant to 35 U.S.C. § 135, between the Gallo et al. patent and Pasteur’s application, Serial No. 558,109.