G.E. BOGGS & ASSOCIATES, INC., Appellant,

v.

Ronald W. ROSKENS, Administrator of the Agency for International Development, Appellee.

No. 91–1214.

United States Court of Appeals, Federal Circuit.

July 2, 1992.

Joseph J. Petrillo, Petrillo & Hordell, Washington, D.C., argued for appellant. With him on the brief was Eric L. Lipman.

Robert E. Kirschman, Jr., Attorney, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Martha H. DeGraff, Asst. Director.

Before NEWMAN, MAYER and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

G.E. Boggs & Associates, Inc. (Boggs) appeals from the October 31, 1990 decision of the Armed Services Board of Contract Appeals (Board) finding the Contract Disputes Act and the Prompt Payment Act inapplicable to Boggs's contract claims and denying Boggs's claim for legal fees and management costs. *G.E. Boggs & Associates,* ASBCA Nos. 34841, 34842, 36792, 91–1 B.C.A. (CCH) ¶ 23,515, 1990 WL 186287 (Oct. 31, 1990). We agree that the Contract Disputes Act does not apply to the Boggs contracts adopted by the administrator of the Agency for International Development (AID). For this reason, we lack jurisdiction to hear this appeal and transfer this case to the United States Claims Court.

## I

In 1982, Boggs entered into two related contracts with the government of the Syrian Arab Republic (Syria) to improve the water supply in Damascus, Syria. These contracts were "host country contracts" funded through a loan agreement between AID and Syria. No entity of the U.S. government was a signatory to the contracts, but AID funding approvals were a condition precedent to the effective date of the contracts and the commencement of work. In 1983, there were two memorable terrorist attacks on American servicemen and embassy personnel in Beirut, Lebanon in which Syria may have played a role. Consequently, on November 13, 1983, Congress passed a joint resolution, part of a continuing resolution making appropriations for fiscal year 1984, directing the administrator of AID to terminate the U.S. economic assistance program to Syria.

> None of the funds heretofore appropriated or otherwise made available for Syria for the purposes of carrying out the provisions of chapter 4 of part II of the Foreign Assistance Act of 1961 ... shall be expended after the date of enactment of this joint resolution [Nov. 14, 1983]. The Administrator of the Agency for International Development is directed to terminate the economic assistance program to Syria.... The Administrator of the Agency for International Development is authorized to adopt as a contract of the United States Government, and assume any liabilities arising thereunder (in whole or in part), any contract with a United States contractor which had been funded by the Agency for International

Development prior to the date of enactment of this joint resolution.

H.J. Res. 413, Pub.L. No. 98–151, § 101(b)(1), 97 Stat. 964, 967 (Nov. 13, 1983) (codified at 22 U.S.C. § 2346a note (1988)). Eight days later, on November 22, 1983, Congress enacted the Department of State Authorization Act which, *inter alia,* restated Congress' termination of assistance programs to Syria.

> SEC. 1004.(a) After the enactment of this section, funds available to the Agency for International Development may not be used for any payment or reimbursement of any kind to the Government of Syria or for the delivery of any goods or services of any kind to the Government of Syria.
>
> (b) The Administrator of the Agency for International Development shall deobligate all funds which have been obligated for Syria under the Foreign Assistance Act of 1961 prior to the enactment of this section, except that—
>
> \*    \*    \*    \*    \*    \*
>
> (2) the Administrator may adopt as a contract of the United States Government any contract with a United States or third-country contractor which would otherwise be terminated pursuant to this subsection, and may assume in whole or in part any liabilities arising under such contract....

Department of State Authorization Act, Fiscal Years 1984 and 1985, Pub.L. No. 98–164, § 1004, 97 Stat. 1017, 1057 (1983) (codified at 22 U.S.C. § 2346a note (1988)).

On January 10, 1984 Boggs requested in writing that the AID administrator adopt the contract, in Boggs's words, "to hold it harmless under the circumstances caused by the enactment of the Joint Resolution." In that letter, Boggs specified the relief it sought from AID's adoption of the contracts: (1) payment of uncontested invoices for work already performed and (2) direct and contingent costs of terminating the contracts. On March 9, 1984 the AID administrator stated his intent to adopt the contracts for the purpose of terminating them, under Federal Procurement Regulation (FPR) section 1–8.702 (termination for convenience) and FPR section 1–7.102.12 (dispute settlement). Boggs agreed to the adoption and termination procedures by executing each letter of adoption. The AID administrator terminated the contracts for convenience that same day. From January 1985 through February 1987 Boggs and AID negotiated a contract termination settlement. Eventually, AID offered to pay $4,590,728 as the total termination payment to cover the two contracts. That amount included payment for Boggs's termination inventory of computer, communications and office equipment to which AID received title. Boggs found this amount unacceptable, and on March 2, 1987 filed a certified claim under the Contract Disputes Act with the contracting officer. Boggs reserved the right to file future claims for management and legal costs. The Board assumed jurisdiction over Boggs's appeal of this claim when the government failed to issue a contracting officer decision. On August 11, 1987 Boggs filed a second certified claim on the issues previously reserved. The AID contracting officer denied that claim on January 26, 1988, and Boggs appealed that denial to the Board.

## II

Boggs asserted claims for lost collateral, general and administrative expenses, legal fees, management costs, additional profit, Contract Disputes Act interest and Prompt Payment Act interest before the Board. The Board found that it did not have jurisdiction over the appeals under the Contract Disputes Act because the contracts were not agreements between Boggs and an executive agency for the procurement of property as required by 41 U.S.C. § 602(a)(1) (1988). "The contractual relationship between appellant and AID was not entered into for the purpose of procurement, but for the purpose of mitigating the effects of certain legislation...." *Boggs,* 91–1 B.C.A. (CCH) at 117,906. The Board proceeded to exercise its jurisdiction over the appeal under the disputes provisions of the parties' adoption agreements granting Boggs's claims for certain expenses and profit in the amount of $298,428, in addi-

tion to the $4,590,728 previously offered by AID, and denying Boggs's claims for attorneys fees, management costs, increased profit and interest. *Id.* at 117,906–10. Boggs appeals that decision to this Court asserting that the Board erroneously concluded that the Contract Disputes Act did not apply to Boggs's contracts. Boggs further asserts that the Board erred in finding that Boggs had not presented sufficient evidence to recover its legal costs and expenses and management costs, and in denying Boggs's claim for Prompt Payment Act interest.

### III

█ A court must, in the first instance, determine whether it has jurisdiction to hear an appeal. *Mansfield, Coldwater & Lake Mich. Ry. Co. v. Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 511, 28 L.Ed. 462 (1884). It is a "well-established principle that federal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress." *Aldinger v. Howard,* 427 U.S. 1, 15, 96 S.Ct. 2413, 2420, 49 L.Ed.2d 276 (1976). Pursuant to 28 U.S.C. § 1295(a)(10) (1988), this Court only has jurisdiction over an appeal directly from a final decision of an agency board of contract appeals if that decision has been made pursuant to § 8(g)(1) of the Contract Disputes Act of 1978, 41 U.S.C. § 607(g)(1) (1988). If the Contract Disputes Act does not apply to the Boggs contracts adopted by the AID administrator, this Court lacks jurisdiction over this appeal to decide whether the Board erred in denying Boggs's claims. *Zinger Constr. Co. v. United States,* 753 F.2d 1053, 1054 (Fed.Cir.1985); *Tatelbaum v. United States,* 749 F.2d 729, 730 (Fed.Cir.1984); *North Am. Corp. v. United States,* 706 F.2d 1212, 1213 (Fed.Cir.1983).

█ The Contract Disputes Act applies to contracts entered into by an executive agency for:

  (1) the procurement of property, other than real property in being;

  (2) the procurement of services;

  (3) the procurement of construction, alteration, repair or maintenance of real property; or

  (4) the disposal of personal property.

41 U.S.C. § 602(a) (1988). In order for us to decide the jurisdictional question, we must determine whether the Boggs contracts adopted by the AID administrator are contracts for the procurement of goods or services by an executive agency, a question of law on which this Court must exercise independent judgment. *Pasteur v. United States,* 814 F.2d 624, 626 (Fed.Cir. 1987).

### IV

Boggs contends that the language of House Joint Resolution 413 and the Department of State Authorization Act as well as the sparse legislative history which accompanies them articulate Congress's intent to accord domestic contractors all the benefits and protections of federal procurement law, including the application of the Contract Disputes Act, when Congress authorized the AID administrator to adopt contracts terminated as a result of the deobligation of funds to Syria.

We agree that Congress intended the AID administrator to adopt the contracts as government contracts. Both House Joint Resolution 413 and the Department of State Authorization Act, Fiscal Year 1984 and 1985 authorize the AID administrator to adopt these contracts "as a contract of the United States." 22 U.S.C. § 2346a note (1988). Not all government contracts, however, fall within the Contract Disputes Act. *Coastal Corp. v. United States,* 713 F.2d 728, 730 (Fed.Cir.1983). The scope of the Act is limited, *inter alia,* to express or implied contracts by an executive agency for the procurement of services and property and for the disposal of personal property. *Id.* For example, this Court has held that an implied contract defining the way the government must deal with bids in the process of selecting a contractor is not a contract for goods or services and does not come within the scope of the Contract Disputes Act. *Id.* Similarly, this Court decided that the Contract Disputes Act did not

apply to a contract primarily designed to facilitate transfer of Acquired Immune Deficiency Syndrome-related research materials because the donative nature of the contract precluded it, as a matter of law, from being characterized as a contract for the procurement of property or services. *Pasteur*, 814 F.2d at 628.

In determining whether Boggs's contracts are within the scope of the Contract Disputes Act, we are mindful of the legislative intent behind that Act. Congress created the Contract Disputes Act to promote economy, efficiency and effectiveness in the government's procurement of goods. Accordingly, the associated regulations emphasize the buyer-seller relationship. *Id.* at 627–28.

■ It is clear from the face of the Congressional enactments that AID was provided authority to adopt Boggs's contracts in order to assist Boggs in adverse circumstances not of its making. AID's mandate was to deobligate funds and for all practical purposes thus terminate existing Syrian host country contracts. Assistance from AID to U.S. contractors, however, was not mandated; AID was not *required* to adopt Boggs's contracts. Once AID decided to provide assistance, it could do so in "whole or in part." 22 U.S.C. § 2346a note (1988). In no way, therefore, can the statutory enactments themselves be read to support a relationship between AID and Boggs as one of buyer and seller in a procurement contract environment.

Moreover, the actual relationship between AID and Boggs was not that of a buyer and a seller. The purpose of the AID administrator's contract adoptions was to mitigate the effect of cutting off assistance to Syria on certain American contractors who had contracted with the government of Syria. *See* S.Rep. No. 245, 98th Cong., 1st Sess. 111 (1983) (Senate Report on Senate Bill No. 1892, the rele-

vant portion of which appears to have been enacted in House Joint Resolution 413). The AID administrator did not enter into the adoption agreements with Boggs for the purpose of procuring any goods or services for an executive agency of the federal government. To the contrary, the sole and express purpose of the AID–Boggs contracts was to terminate the Syria–Boggs contracts for convenience, and to employ federal contract regulations to determine the sums due to Boggs following such a termination.

That Boggs was required to accept termination and dispute resolution procedures set out in the FPR does not transform the contracts into procurement contracts under the Contract Disputes Act. Those procedures did not direct Boggs to provide the AID administrator with the goods or services central to the contracts, a water supply system.* Instead, they merely provided the legal framework in which Boggs and AID could determine the metes and bounds of the remedy that Boggs would receive under AID's termination for convenience of the contracts. Boggs's contracts with the AID administrator are not contracts for the procurement of goods and services simply because the government wished to terminate them pursuant to familiar regulations designed to achieve that end. Congress in fact recognized the useful role existing federal contract regulations would play in effecting the anticipated terminations for convenience. S.Rep. No. 245 at 111.

Boggs's contracts also do not fall within the purview of the Contract Disputes Act because such contracts must be for the direct procurement of goods or services by an executive agency of the government. *See New Era Constr. v. United States*, 890 F.2d 1152, 1157–58 (Fed.Cir.1989) (financing by Department of Housing and Urban Development of construction to be done by nonfederal agency not a Contract Disputes

---

* It is true that AID acquired some property from Boggs and its subcontractors through the termination procedures. That property included computer hardware and software to operate a reservoir system, communications equipment and office equipment. We agree with the Board that transfer of title to AID of "some termination inventory pursuant to the parties' adoption agreement was only incidental to, and not the purpose of those agreements." *Boggs*, 91–1 B.C.A. (CCH) at 117,906. AID's receipt of termination inventory only permitted it to mitigate the government's losses incurred in coming to Boggs's aid.

Act contract because contract not for direct benefit or use of federal government); *Tatelbaum,* 749 F.2d at 730 (contract with Government Printing Office (GPO) not a Contract Disputes Act contract because GPO not an executive agency). It is for this reason that Boggs's reliance on *United States v. General Elec. Corp.,* 727 F.2d 1567 (Fed.Cir.1984) is misplaced. In that case, this Court held that a General Electric contract with the Air Force to supply jet engines destined for foreign military sales was justiciable under the Contract Disputes Act. Unlike Boggs, however, General Electric directly contracted with an executive agency of the U.S. government to produce the jet engines. *Id.* at 1568. The engines' final point of transfer was irrelevant to General Electric. By contrast, Boggs directly contracted with Syria to build the waterworks. The AID administrator never contracted to receive such a water system; AID's mandate was to terminate the contracts after Congress cancelled monetary assistance to Syria.

In addition, the policy rationale behind the Contract Disputes Act, designing an efficient disputes resolution system to encourage quality contractors to competitively provide goods and services to the U.S. government, is neither impaired nor promoted by excluding these contracts from the Act. *See Pasteur,* 814 F.2d at 627 (quoting S.Rep. No. 1118, 95th Cong., 2d Sess. 4 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5235, 5238). Boggs's original contract, after all, was with Syria, not the U.S. government. When Congress, through AID, obligated millions of dollars to ease the burden of loss that contractors like Boggs sustained as a result of the termination of foreign assistance to Syria Boggs' expectation of recovery must have been met or exceeded. Moreover, " 'those who enter into ... contracts overseas do so in light of one salient fact of economic life: that their ability to perform and compel performance is contingent upon the continuation of friendly relations between nations.' " *Chang v. United States,* 859 F.2d 893, 897 (Fed.Cir.1988) (quoting *Chang v. United States,* 13 Cl.Ct. 555, 559–60 (1987)).

For these reasons we hold that Boggs and AID did not contract under the Contract Disputes Act.

## V

We lack jurisdiction to hear this appeal because Boggs's contracts are not within the scope of the Contract Disputes Act. The Board made its determination pursuant to the disputes clause of the contracts. *Boggs,* 91–1 B.C.A. (CCH) at 117,906. The parties request that we not dismiss this action, but transfer it to the Claims Court. Accordingly, we do so pursuant to 28 U.S.C. § 1631 (1988).

No costs.

TRANSFERRED.