MARKETING AND MANAGEMENT
INFORMATION, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 99–194C.

United States Court of Federal Claims.

Aug. 25, 2003.

Charles J. Cooper, Washington, D.C. for the plaintiff. With him on the briefs were Vincent J. Colatriano, Derek Shaffer, Nikki Chtaini, of counsel.

Sheryl Floyd, Commercial Litigation Branch, Civil Division, Department of Justice for the defendant. With her on the briefs were Thomas D. Rathgeb and Elliott Clark, Office of General Counsel, Defense Commissary Agency.

## OPINION

BRUGGINK, Judge.

This case arises out of a 1995 request by the government for proposals to purchase and process scanner data collected by military commissaries. A contract was awarded by the Defense Commissary Agency ("DCA") to plaintiff, Marketing and Management Information, Inc. ("MMI") on October 26, 1995. It is the termination of that contract which is in dispute. The case raises novel questions concerning the interpretation and application of the now-repealed Brooks Automatic Data Processing Act, Pub.L. No. 89–306, 79 Stat. 1127 (codified at 40 U.S.C. § 759, repealed effective August 7, 1989) ("Brooks Act").

Pending are cross-motions for partial summary judgment on two alternative defenses: whether plaintiff's contract was subject to the Brooks Act (in which event it might be void *ab initio*), and whether the government's termination for convenience was authorized under the contract. Oral argument was held on June 12, 2003. For reasons set out below, we conclude that the contract was not subject to the Brooks Act and that the contract did not authorize termination for convenience.

## BACKGROUND

DCA is an agency of the Department of the Defense, created in 1990 to oversee the operation of commissaries for military personnel, their families and other authorized persons. 32 C.F.R. § 383a.1 (1995). DCA receives funds from three distinct sources: a commissary operating account annually funded by Congress, a commissary resale stock account generated from the resale of groceries, and a commissary trust revolving fund generated from a five percent surcharge on sales. 32 C.F.R. § 383a.8(e). Included with the commissary trust revolving funds are monies received as a result of equipment salvage, discounts earned from distribution centers, and receipts from the sale of data on product movement.

DCA commissaries are outfitted with scanners which are capable of collecting the type of data referred to in 10 U.S.C. § 2487(a)(2) (2002):

Information contained in the computerized business systems of commissary stores or the Defense Commissary Agency that is collected through or in connection with the use of electronic scanners in commissary stores, including the following information:

(i) Data relating to sales of goods or services.

(ii) Demographic information on customers.

(iii) Any other information pertaining to commissary transactions and operations.

Collectively, this information is known as "product movement data." DCA is authorized to sell such information through competitive procedures. 10 U.S.C. § 2487(b)(1). Revenue generated by the sale of product movement data is credited to DCA's commissary trust revolving fund. 10 U.S.C. § 2487(d). MMI and the Air Force had a previous contract, awarded in October 1989, for the processing of this raw scanner data. The last option year was to end on December 31, 1995.

DCA issued request for proposal ("RFP") DCA01–94–R–0068 on June 1, 1995 for a sales contract pursuant to which DCA would release product movement sales data from its commissaries to the contractor in exchange for a share in the revenue generated by sale of that information and for "Analytical Support Services for Category Management." The RFP, therefore, contemplated no money flowing from the agency to the contractor.

Category management was defined by the RFP as "a process that involves managing product categories as strategic business units and customizing them on a store by store basis." Analytical support services necessary for category management were defined by the RFP as "output reports, [and] a capability for DCA to electronically transfer and manipulate data, and recommendations to develop and improve category management and merchandising strategies." Category management, then, amounted to a process for analyzing product movement data to determine which products most efficiently and accurately met consumer preferences.

The RFP provided for award to a single contractor, who would have the right to process product movement data from the commissaries operated by DCA. The RFP called for a base term of three years with two option years at the election of DCA. DCA's belief that the contract would not involve the expenditure of any appropriated funds was communicated to bidders: "THIS CONTRACT DOES NOT INVOLVE THE EXPENDITURE OF ANY FUNDS APPROPRIATED BY THE U.S. CONGRESS." The contractor was to bear the cost of acquiring the product movement data, which the contractor would then manipulate at its own expense to provide analytical support services for category management to DCA.

The RFP included a stop work order provision:

> The Contracting Officer may, at any time, by written order to the Contractors, require the Contractor to stop all, or any part, of the work called for under this contract for a period of 90 days after the order is delivered to the work order issued under this clause. Upon receipt of the order, the Contractor shall immediately comply with its terms and take all reasonable steps to minimize the incurrence of costs allocable to the work covered by the order during the period of work stoppage. Within a period of 90 days after a stop-work is delivered to the Contractor, or within an extension of that period to which the parties shall have agreed, the Contracting Officer shall either—
>
> (1) cancel the stop-work order, or
>
> (2) terminate the work covered by the order as provided in the Default, or the *Termination for Convenience of the Government,* clause of this contract.

(emphasis supplied). Despite the reference in the last paragraph, there was no termination for convenience clause in either the final RFP or the contract with plaintiff.

The omission of the termination for convenience clause was not accidental. A pre-proposal conference was held on July 10, 1995. Attendees were informed that the contract would not contain a termination for convenience clause, although it would contain

the standard default clause. The attendees were also apprised that there were no current regulations covering a contract of this type, namely, one in which no funds, appropriated or otherwise, were expended by the agency. DCA explained that the RFP contemplated a "sale exchange contract," which is not a type "specifically referenced in the federal acquisition regulations." (July 10, 1995 pre-proposal conference transcript).

MMI submitted a proposal to DCA in August 1995. A.C. Nielsen Company ("Nielsen"), Information Resources, Inc. ("IRI") and Management Science Associates, Inc. ("MSA") also submitted proposals. MMI's proposal offered, in consideration for DCA product movement data, to provide category management support services at no cost and to pay the agency at least 15% of MMI's gross proceeds from selling the product movement data. MMI proposed a guaranteed payment to DCA of $6.659 million over the three year base term. DCA awarded the contract to MMI on October 26, 1995.

On November 6, 1995 Nielsen filed a protest at the General Services Administration Board of Contract Appeals ("GSBCA") challenging the award to MMI. IRI and M.S.A. § intervened to support the protest. On November 14, 1995, the contracting officer issued a stop work order. MMI was ordered to cease all work for "a period not to exceed 90 calendar days ... or until this order is cancelled by the Contracting Officer." The prior existing contract for processing raw scanner data was extended from December 31, 1995 to March 31, 1996.[1]

In its protest, Nielsen argued that the solicitation was void because it failed to comply with the Brooks Act. This Act required federal agencies to obtain a delegation of procurement authority from the General Services Administration ("GSA") before acquiring automatic data processing equipment ("ADPE") or services. On February 23, 1996 the GSBCA held that the contract was, indeed, void *ab initio* because it was subject to, but did not comply with, the Brooks Act. DCA was directed to reassess the procurement in accordance with the Brooks Act and appropriate regulations.

MMI appealed the GSBCA's decision to the Federal Circuit on May 19, 1998. During the pendency of that appeal, on September 30, 1996, DCA issued Amendment 0002 to the RFP cancelling the solicitation. It offered the following rationale: "[b]ased on the current and projected needs of the agency, it has been determined that the requirements set forth in this solicitation no longer adequately describe the needs of the agency. This solicitation is hereby cancelled in its entirety." The protestors who had been successful at the GSBCA then moved to dismiss MMI's appeal. On May 19, 1998 the Federal Circuit dismissed the appeal as moot, simultaneously vacating GSBCA's decision. *Marketing & Mgmt. Info. v. Beale*, No. 96–1270, 1998 WL 314626, 1998 U.S.App. LEXIS 10199 (May 19, 1998). The court stated:

> We conclude that the withdrawal of the solicitation moots the question of the propriety of its original solicitation. Although MMI has raised cogent concerns as to its remedies, this issue is not before us .... Although we do not express an opinion on the correctness of DCA's position, we must agree that the issue of MMI's recovery is not before us. Whether DCA's action is viewed as a breach of contract, whether the contract was properly terminated for convenience, and the question of remedy to MMI, were not before the GSBCA. We believe that all concerned are best served by restoring the matter in the first instance to the parties for speedy and just settlement; and thereafter, should settlement fail, by resolution through the procedures of the Contract Disputes Act, 41 U.S.C. § 601 *et seq.* This dismissal and vacatur [of the GSBCA's decision] are without prejudice to any further proceedings flowing from the award of, challenge to, and withdrawal of this contract.

*Id.* at *2, 1998 U.S.App. LEXIS 10199 at *4–*6.

On June 12, 1998 MMI sent a letter to the contracting officer, expressing its desire to

---

1. In 1990 the Air Force ceased to operate its own commissaries. Instead, DCA was established to run commissaries for the entire Department of Defense. Defense Commissary Agency, 55 Fed. Reg. 49,279 (Nov. 27, 1990) (codified at 32 C.F.R. § 383a.1)

perform the contract as awarded. MMI explained that, because the Federal Circuit had vacated the GSBCA decision, there was no further bar to MMI performing on the contract. On June 12, however, DCA sent a "Notice of Termination" to MMI. DCA explained that it considered the Federal Circuit's dismissal to mean that DCA's September 20, 1996 cancellation of the solicitation effectively terminated the contract for the convenience of the government.[2] According to DCA, although a termination for convenience clause was not expressly included in the contract it should be read in pursuant to *G.L. Christian & Assoc. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418 (1963) (finding that essential and mandatory clauses must be read into a contract even where omitted).

On September 10, 1998 MMI submitted a certified claim for approximately $44.6 million in damages. The contracting officer issued a final decision denying the claim on February 25, 1999. Plaintiff filed this action on April 2, 1999. The case was transferred to this judge in May, 2001. The parties subsequently agreed to limit the initial cross motions for summary judgment to the issues of whether the Brooks Act applied to this RFP, and, alternatively, whether the contract allowed the government to terminate MMI for convenience.

## DISCUSSION

Defendant offers two separate, but related, defenses to the suit. First, defendant argues that the contract is void *ab initio* because the agency failed to follow the procedures required by the Brooks Act. Specifically, the Brooks Act required a delegation of procurement authority by GSA in the event of purchase of ADPE in an amount exceeding $10,000,000. Defendant claims the services at issue consisted of ADPE and thus a lack of a delegation of authority was fatal.

Defendant's argument rests on two disputed points. The first is whether the contract

sought ADPE. If it did not, then the Brooks Act would not apply. Although we have significant reservations as to whether the subject matter of the contract constitutes ADPE, because resolution of that issue would involve the expenditure of significant litigation resources, we directed the parties to focus on the second element, namely, whether this was a "procurement" at all. If the government is correct, the case might be resolved on that basis alone.

Second, defendant urges that even if the Brooks Act does not apply, termination for convenience by the agency was appropriate pursuant to the Federal Acquisition Regulations ("FAR"). This argument is linked to the first in that both turn, at least in part, on whether the contract involved a "procurement." For the reasons set out below, we find that both of the government's defenses fail.

*Application of the Brooks Act*

Plaintiff asserts that because the RFP would not lead to a procurement, the Brooks Act did not apply. We begin with 40 U.S.C. § 759, the section under which the Brooks Act was codified. It was captioned "Procurement, maintenance, operation and utilization of [ADPE]." The administrator of GSA, moreover, was given authority to provide for "purchase, lease and maintenance" of ADPE. § 759(a)(1). In the absence of any other explicit language as to the scope of the Act, this authority plainly suggests a concern with "purchase, lease or maintenance" of ADPE, and that these actions constitute "procurement."

The administrator's authority was also referred to in that portion of the Brooks Act giving the GSBCA jurisdiction over protests. GSBCA was empowered to review any decision of a contracting officer "in connection with any procurement that is subject to [the Brooks Act]." § 759(f)(1); *Best Power Tech. Sales Corp. v. Austin*, 984 F.2d 1172, 1175 (Fed.Cir.1993).[3] The "procurement authori-

---

2. The Notice of Termination does not explain why a formal notification of termination was necessary if the contract had already been terminated for convenience by the withdrawal of the solicitation on September 20, 1996.

3. Congress amended this section to allow the GSBCA to exercise jurisdiction over both those procurements which are actually subject to the Brooks Act, as well as those which should have been conducted under the Brooks Act. *United States v. Int'l Bus Machines Corp.*, 892 F.2d

ty of the Administrator," moreover, was to be suspended in connection with a protest. § 749(f)(B)(i). The Act thus suggests that it grants "procurement" authority.

When interpreting a statute, we must "avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous." *Reeves v. United States,* 54 Fed.Cl. 652, 659–660 (2002) (citing *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001)). To interpret the Brooks Act as applying to anything other than procurements would be at odds with the language quoted above. We find that the Brooks Act is limited to procurements.

This conclusion is in concert with the Federal Circuit's decision in *Best Power,* 984 F.2d at 1175, which involved a construction of portions of the Brooks Act. The court held that "a given procurement is subject to the Act-and therefore to the GSBCA jurisdiction over any protest arising therefrom-if it is one for ADPE." *Id.* (citing 40 U.S.C. § 759(f)(1)). The question before the court in *Best Power* was whether the goods purchased by the General Services Administration were ADPE, admittedly not the question addressed here. The goods procured by GSA and those actually furnished were not identical. The GSBCA erroneously determined that, when deciding whether the Brooks Act applied, it should examine the goods furnished. *Id.* While the Circuit did not directly address whether the Brooks Act applies *only* to procurements, it uniformly described the Act's application exclusively in terms of procurements.

Our analysis is also supported by *United States v. Citizens & S. Nat'l Bank,* 889 F.2d 1067, 1069–70 (Fed.Cir.1989). The question initially put to the Federal Circuit was whether the selection of Riggs National Bank as the lead bank for depositories under the National Bank Act was a "procurement" under the Brooks Act. The Federal Circuit

questioned GSBCA's assumption that the choice of the Riggs National Bank was a procurement. The Federal Circuit counseled GSBCA first to determine whether the action by the Treasury constituted a procurement, thus triggering application of the Act.[4]

For the Brooks Act to apply here, in short, the contract had to involve a procurement. But what is a procurement? In that respect, the Brooks Act gave no guidance. There is no definition of procurement within the text. The House Report sponsoring the act contemplates application to the "purchase, lease and utilization" of ADPE with an overall purpose of assuring "that the appropriate control over the expenditure of funds by a Federal agency remains in the Congress." H. Rep. No. 89–802 at 38, 40 (1965); 111 CONG. REC. 28203–05 (1965). The plain suggestion, then, is that Congress was concerned with how appropriated funds were being used to procure ADPE. The Senate Report makes numerous references to a concern with meeting the Government's ADPE requirements "at minimum cost" to the government. S.Rep. No. 89–938 at 44 (1965), U.S.Code Cong. & Admin.News 1965, pp. 3859, 3897.

GSA promulgated interpretive regulations for the Brooks Act, styled the Federal Information Resources Management Regulations ("FIRMR"). *See Chevron USA, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The FIRMR, unfortunately, offers no specific definition of the term "procurement." Plaintiff contends that we therefore look to the FAR. We agree. The FIRMR is "organized for consistency with the [FAR]" and "contains only those contracting policies and procedures [which] are unique" to the FIRMR. 41 C.F.R. § 201–39.101–1 (1995).

At the time the RFP was issued and subsequently awarded, the FAR contained no definition of procurement. *See* 48 C.F.R.

---

1006, 1010 (Fed.Cir.1989) (citing Paperwork Reduction Reauthorization Act of 1986, Pub.L. No. 99–591, 100 Stat. 3341–335 (codified at 40 U.S.C. § 759(f)(1) (Supp. V 1987))). The amendment, however, did not change the requirement that the GSBCA has jurisdiction only over procurements.

**4.** *Citizens* is not directly on point, however, in that the precise holding was that no contract existed and the designation of Riggs Bank was much like the "appointment of a federal employee." *Id.* at 1070.

("FAR") § 2.101 (1995) (definition section). Subsequently, a definition of procurement was added, which simply reads "see acquisition." FAR § 2.101 (2002). Even prior to that amendment, however, both the FAR and this court consistently used the terms acquisition and procurement interchangeably.[5]

In 1995 the FAR provided a definition of acquisition: "the acquiring by contract with appropriated funds of supplies or services ... by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence must be created, or developed." *Id.* We conclude that this definition applies to the term procurement as used in the Brooks Act. For aught that appears, therefore, the Brooks Act only applies when an agency acquires supplies or services through the obligation of "appropriated funds." This contract would appear to involve the obligation of no government funds, much less appropriated funds.

■ Defendant contends that this is too cramped a reading of the FAR, and hence of the Brooks Act. While agreeing that the FAR applies to contracts under the Brooks Act, it urges that a focus on procurement only through appropriated funds is too narrow; that the concept of barter-which appears to be the substance of the contract at issue-should be included. Defendant points out that the FAR definition of acquisition includes the term "purchase," which defendant contends embraces barter as well as an exchange for money. *See* FAR § 2.101. For support, defendant turns to a Black's Law Dictionary definition of "purchase" as the "transmission of property from one person to another by voluntary act and agreement founded on valuable consideration," BLACK'S LAW DICTIONARY 1110 (5th

ed.1979), a definition presumably broad enough to include barter.[6]

Defendant also urges that an examination of the history of the FAR suggests an earlier willingness to embrace the concept of barter. Defendant asks us to rely on the regulations in effect prior to the FAR, when GSA purchases were governed by the Federal Procurement Regulations (FPR). The FPR defined procurement as:

> the acquisition (and directly related matters), from non-Federal sources, of personal property and non-personal services (including construction) by such means as purchasing, renting, leasing (including real property), contracting or *bartering*, but not by seizure, condemnation, donation, or requisition.

32 C.F.R. § 1–201.13 (1983) (emphasis added).

Subsequently, a unified system of procurement, which would become the FAR, was contemplated. Defendant points to a policy letter promulgated as the FAR was being drafted. The Office of Federal Procurement Policy Letter ("OFPL") 80–5. 45 Fed.Reg. 48,074 (July 17, 1980) ("Policy Letter"), defined an acquisition as:

> the acquiring by contract of supplies or services (including construction) by and for the use of the executive agencies of the Federal Government through purchase, lease or *barter*, whether supplies or services are already in existence or must be created, or developed, demonstrated or evaluated.

45 Fed.Reg. at 48,075 (emphasis supplied).

Defendant urges that we rely on the historical inclusion of "barter" in the FPR, and its mention in the Policy Letter. The defendant suggests that, because the non-appearance of the concept of barter in the current

---

5. *See, e.g.,* FAR § 48.702 (1995) (outlining the appropriate procedures for acquisition planning by delineating requirements for procurements); FAR § 39.103(d) (1995) (providing for the incremental purchase of information technology, using acquisition and procurement interchangeably in the same subpart); *Cubic Def. Sys. v. United States,* 45 Fed.Cl. 239, 242 (1999) (discussing the Department of Defense's authority to procure in an expedited manner, referring to FAR § 5.207(e)(3) which gives acquisition authority).

6. We note that the definition of purchase proposed by defendant is found in the Fifth Edition of Black's Law Dictionary. The definition found in the current edition of Black's is not as helpful to defendant. It defines purchase as "the act or instance of buying real property by one's own or another's act (as by will or gift) rather than by descent or inheritance." BLACK'S LAW DICTIONARY (7th ed.1999).

FAR is unexplained, we should read the term in. We find that the opposite is true. Where a term is contemplated in drafting, but is not included in the final regulation, we must assume that the exclusion is purposeful. *See* NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 48:04 (6th ed.2000).

Furthermore, Policy Letter 80–5 was officially rescinded and replaced when a new policy letter, OFPL 85–1, became effective on October 1, 1985. The latter does not include barter in its definition of acquisition. 50 Fed.Reg. 34,778 (Aug. 27, 1985). These Letters, in any event, were rescinded after adoption of a unified system of federal procurement procedures in the form of the FAR, which did not incorporate the earlier definition inclusive of barter.

As defendant suggests, the drafters of the FAR were required to "reduce proliferation of regulations; to eliminate conflicts and redundancies; and to provide an acquisition regulation that is simple, clear and understandable." Notice of Availability and Request for Comment on Draft Federal Acquisition Regulations, 46 Fed.Reg. 42,303 (August 20, 1981). The FAR was promulgated so that the multiple federal procurement regulations would be in concert. However, it is not surprising, then, that in the integration process there would be substantial differences between FAR and its predecessor regulations. We conclude that the omission of "barter" was deliberate.[7]

Defendant next urges that we should consider the definition of procurement in the FAR in light of the Federal Grant and Cooperative Agreement Act of 1977 ("FGCAA"). The FGCAA was designed to promote "a better understanding of United States Government expenditures and help eliminate unnecessary administrative requirements." 31 U.S.C. § 6301 (2002). It assists in distinguishing between procurement contracts, cooperative agreements, and grant agreements. Under the FGCAA, the appropriate time to use a procurement contract is when:

the principle purpose of the instrument is to acquire (by purchase, lease or barter) property or services for the direct benefit or use of the United States Government; or the agency decides in a specific instance that the use of a procurement contract is appropriate.

31 U.S.C. § 6303 (2000). Defendant does not argue that the FGCAA applied to the contract before us. Instead, it argues that we should interpret the Brooks Act in light of such other federal procurement statutes. There was no necessary connection between the Brooks Act and the FGCAA, however. Moreover, the language cited does not purport to be a definition of a procurement contract. While we acknowledge that there may be differences between the FGCAA and the Brooks Act, we are unwilling to resolve them by simply incorporating the FGCAA into the Brooks Act.

Defendant also cites two cases for the proposition that an acquisition by purchase, lease or barter, of property or services for the direct benefit or use of the Federal Government characterizes a federal procurement, *New Era Construction v. United States*, 890 F.2d 1152, 1157 (Fed.Cir.1989) and *Bonneville Assoc. v. United States*, 43 F.3d 649, 653 (Fed.Cir.1994). Both decisions rely on *Mayer*, 84–2 B.C.A. (CCH) ¶ 17,494, 1984 WL 13451, which does, indeed, characterize a procurement as including acquisition of property through barter. The question of whether procurement embraced barter was not, however, decisive in either *Mayer* or the Federal Circuit decisions, and none of these cases involved the Brooks Act.

Defendant also draws support for its reliance on the concept of barter from the decision of the GSBCA in *Metaphor Computer Systems, Inc.*, 1990–2 B.C.A. (CCH) ¶ 22,674, 1990 WL 7378 (1990). In *Metaphor*, the GSBCA examined a contract which, in all material elements, is identical to the one we examine here. It also involved the sale of

---

**7.** We do not find the inclusion of the FPR's definition of procurement in *Institut Pasteur v. United States*, 814 F.2d 624, 628 (1987), persuasive here. The operative facts all occurred prior to the date the FAR became effective. Further, the court in *Pasteur* quotes the FPR as further support that no contract existed in that case. It examines the concept of barter as an alternative means of determining whether a contract existed at all, not whether the concept of barter falls within the Brooks Act.

scanning data in exchange for money and services. One of the issues before the Board was whether the contract involved the "procurement" of ADPE under the Brooks Act.

The GSBCA reasoned that the Brooks Act was applicable because

> [t]he primary function of this procurement is to distribute reports using the Government's scanning data in private industry to encourage vendors of commissary products to sell to commissaries and to schedule promotions for commissary patrons. The secondary purpose is to provide the Government with those same reports. The action is both a procurement of a product (the reports) and the procurement of a service (distribution of the reports to private industry). The reports and their use, not the revenue, is the key. In other words, here, the Government is buying reports and distribution and paying for them with scanning data instead of money.

*Id.* The board, in short, assumed that an exchange of any kind involving ADPE was within the reach of the Brooks Act, irrespective of whether federal funds were involved. For the reasons set out above, we disagree.

Defendant points to two additional decisions as inconsistent with this view, however, *United States v. Int'l Bus. Machines Corp.*, 892 F.2d 1006, 1009–10 (Fed.Cir.1989) and *Rocky Mtn. Trading Co.*, GSBCA No. 8958–P, 1987–2 B.C.A. (CCH) at ¶ 19,840, 1987 WL 40900 (1987). In *Rocky Mtn. Trading*, the question before the GSBCA was whether the Office of the Comptroller of the Currency ("Comptroller"), was subject to the Brooks Act. The Comptroller argued that 12 U.S.C. § 481 (1982) [8] established the Office as a nonappropriated funds entity, and thus it was not subject to the Brooks Act. The GSBCA disagreed. It determined that, even if the Comptroller is a non-appropriated fund entity, it was still subject to the Act. The GSBCA reasoned that the Brooks Act was passed out *of a concern for coordination of resources and efficiency.* Thus, all federal agencies were subject to its requirements, unless given a specific waiver.

We find the GSBCA's analysis unpersuasive. As in *Citizens,* 889 F.2d at 1069–70, the GSBCA did not complete the requisite first step of analysis under the Brooks Act, determining whether a procurement had actually taken place. The GSBCA was correct that where the Brooks Act is applicable, the GSA was authorized to provide for the purchase, lease, and maintenance of ADPE by Federal agencies. 40 U.S.C. § 759(a)(1). The GSBCA concluded that under the Brooks Act the Comptroller was a federal agency. It did not, however, determine whether the Brooks Act was applicable in the first instance. We have explained above that the Brooks Act incorporates the FAR, insofar as the definition of procurement is concerned. That definition is triggered by the use of appropriated funds.

Defendant also relies on *Int'l Bus. Mach.* That case involved a protest of an Invitation for Bids for a computer system issued by the Government Printing Office ("GPO"). The GPO had been given an exemption from the Brooks Act for the fiscal year beginning in 1977. The sole issue was whether the exemption extended beyond that year. The GPO argued that it had an ongoing exemption. The Federal Circuit rejected this argument, finding that the exemption did not apply to any year other than 1977. Defendant cites the case for the proposition that "Congress did not consider the source of the funds relevant in determining the applicability of the Brooks Act." *Int'l Bus. Mach.,* 892 F.2d at 1010. That observation is not material here, however. There is no question that appropriated funds were involved in that case. The only question was whether the unique exemption applied.

We find, therefore, that the Brooks Act applied only to procurements and that the procurement had to involve acquisitions "by contract with appropriated funds of supplies or services ... by and for the use of the

---

8. 12 U.S.C. § 481 states, in relevant part:

[T]he employment and compensation of examiners ... and other employees of the office of the Comptroller of the Currency whose compensation is and shall be paid from assessments on banks or affiliates thereof shall be without regard to the provisions of other laws applicable to officers or employees of the United States.

Federal Government." 48 C.F.R. § 2.101 (1995). Here, no funds, appropriated or otherwise, were utilized.

The government nevertheless argues that, even if it is necessary to link the contract to appropriated funds, and even though no funds were directly involved, they could have been used if, instead of one contract, the agency had divided this into two contracts. Under this argument, DCA could have entered into separate contracts, one for the sale of the product movement data, and another for the purchase of category management services. In that scenario, the purchase of category management services would have utilized appropriated funds from the commissary operating account.[9] This potential use of appropriated funds, defendant concludes, is sufficient to meet the requirement of appropriated funds set out in the FAR.

The simple answer to this hypothetical is that it never happened. "[T]he court may not simply rewrite the contract to achieve an end" the defendant finds to be more desirable. *Coplin v. United States,* 6 Cl.Ct. 115, 127 (1984) (citing *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943)). The contract before us did not utilize appropriated funds, and therefore does not meet the FAR's definition of acquisition. The Brooks Act was thus not applicable to the contract before us. We therefore reject the government's defense that this contract was void *ab initio.*[10]

*Termination for Convenience Clause*

We turn next to the government's alternative argument that it was entitled to terminate the contract for convenience. We begin by stating the obvious. The parties' respective rights and responsibilities would normally be found only within the four corners of the contract. Here, the contract give the agency no express right to terminate for convenience.

■ The government contends, however, that the termination for convenience clause must be read into the contract by operation of law, citing *G.L. Christian,* 160 Ct.Cl. at 15, 312 F.2d 418. *Christian* requires that "mandatory contract clauses which express a significant or deeply ingrained strand of public procurement policy." *General Eng'g & Mach. Works v. O'Keefe,* 991 F.2d 775, 778 (Fed.Cir.1993). The termination for convenience clause is such a "deeply ingrained strand of public procurement policy." *G.L. Christian,* 160 Ct.Cl. at 15, 312 F.2d 418. But, is it mandatory? Defendant argues that the present contract is governed by the FAR, which mandates the inclusion of a Termination for Convenience clause, FAR § 49.502(b)(1)(i), in those contracts which are subject to the FAR. *See N. Star Aviation Corp. v. United States,* 198 Ct.Cl. 178, 180, 458 F.2d 64 (1972).

Unfortunately for defendant, however, the prior analysis as to the FAR's requirement that a procurement utilize appropriated funds blocks this argument. As explained above, procurement and acquisition are synonymous within the FAR. The FAR is clear that an acquisition is "the acquiring by contract with appropriated funds of supplies or services" FAR § 2.101 (2001); *see also San Francisco v. United States,* 615 F.2d 498, 504 (9th Cir.1980). It is uncontested that DCA was required to expend no funds, appropriated or otherwise, by the terms of the contract. Plaintiff urges that, absent the use of appropriated funds, the contract does not fall under the FAR's definition of "acquisition" and so the FAR does not apply. For reasons explained above, we agree that no acquisition has taken place.

■ Defendant next argues that the termination for convenience clause must nevertheless be read into the contract because the stop work order clause, which was expressly included in the contract referenced the agency's option, in the event it invoked the stop

---

9. The parties dispute whether the commissary operating account is an appropriated fund. Plaintiff also argues that the commissary trust revolving account, a non-appropriated fund account, would have been used. In light of our rejection of defendant's argument more generally, it is unnecessary to resolve these issues.

10. If it wishes to pursue it, the argument that the services or data sought did not constitute ADPE remains to plaintiff.

work order clause to "terminate the work covered by the [stop work] order as provided in the Default, or the Termination for Convenience of the Government, clause of the contract." The government argues that this oblique reference gave the contracting officer the power to terminate for convenience. We disagree.

There was a termination for default clause in this contract. There was not a termination for convenience clause. As we explained earlier, it was intentionally omitted. The reference in the stop work order clause to these two standard clauses only makes sense when understood as a cross reference to other options for the agency, *assuming they existed.* The reference was misleading, in that, both clauses were not present. But, in view of the intentional nature of the omission, the contract cannot be construed as including the termination for convenience clause. That was plainly not the parties' intent. To accept the government's argument would achieve the very "weird [and] whimsical result," *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991), against which defendant cautions.

■ Nevertheless, was this a patent ambiguity which should be construed against the plaintiff? A contract contains an ambiguity where there is more than one reasonable interpretation for a contract term. *See Stratos Mobile Networks USA, LLC. v. United States,* 213 F.3d 1375, 1380 (Fed.Cir.2000) (citing *Grumman Data Syst. Corp. v. Dalton,* 88 F.3d 990, 997 (1996)). A patent ambiguity exists where the contract "contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Id.* at 1381.

■ Where a patent ambiguity exists, it raises the "duty of inquiry regardless of the reasonableness of the contractor's interpretation." *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985). This duty requires the contractor to ask the con-

tracting officer the "true meaning of the contract before submitting a bid." *Triax Pac., Inc. v. West,* 130 F.3d 1469, 1475 (Fed. Cir.1997). We find that even if the stop work order clause's reference to the termination for convenience clause created a patent ambiguity, plaintiff fulfilled its duty to inquire.

At the pre-bid conference, at which MMI representatives were present, attendees were informed that "[t]here will not be a termination for convenience clause, because of the nature of this contract." Pl.App. at 210 (transcript of the pre-bid conference). Agency representatives explained that a termination for convenience clause was not necessary. The contract was not governed by the FAR, because it did not involve the expenditure of appropriated funds. The government argues that this inquiry was insufficient. We disagree. The contracting officer was directly asked whether the termination for convenience clause would be included.[11] Plaintiff was under no further duty.

We find no basis, then, to fabricate a termination for convenience clause for the contract. Absent the power delineated by the contract to terminate for convenience, the government's termination constituted a breach. The parties have not addressed whether the breach occurred as of the date of the stop work order, the issuance of Amendment 002, or the termination letter. We, therefore, do not resolve that issue here.

*Breach of Covenant of Good Faith and Fair Dealing*

■ In its cross-motion for summary judgment, the government requested that the court dismiss Count III of plaintiff's complaint, which contends that the contracting officer acted in bad faith when it terminated plaintiff for convenience. Plaintiff alleges that DCA's representation in Amendment 002 that the needs of DCA had changed and were no longer fit by the solicitation was false. Complaint ¶ 37. The needs of the agency did not change, according to plaintiff, simply its willingness to pay MMI for its services. In its reply brief, plaintiff also

---

11. Because the agency answered questions which were given numbers, but not attributed to a particular contractor, we cannot know which

attendee asked the question regarding the termination for convenience clause.

insinuated that Congressional staffers may have attempted to improperly influence the agency to terminate plaintiff for convenience due to personal animus.

A motion to dismiss may be granted only where "it appears beyond doubt that [plaintiff] can prove no set of facts in support of the claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). We must assume that all undisputed facts alleged in the complaint are true, and draw all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

However, the burden of proof for a claim that the government breached its covenant of good faith and fair dealing is a high one. The Federal Circuit has characterized the type of proof required as evidence of a specific intent to injure plaintiff. *Id.* (quoting *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 543 F.2d 1298 (1976)).

The allegations put forward by plaintiff are insufficient, even if true, to permit a finding that there was a breach of the covenant of good faith and fair dealing. Even if plaintiff is correct and DCA's need did not change, but it simply decided that it no longer liked the terms of the contract it had with MMI, this does not constitute evidence of intent to injure plaintiff. Although we disagree, it is understandable that the agency might construe the Board's initial sustaining of the protest as tainting the contract.

Plaintiff's allegations in its reply brief that individuals outside DCA attempted to put pressure on the agency to terminate the contract because of personal animus towards MMI are more closely related to its burden of proof. Plaintiff, however, acknowledges that DCA "witnesses have testified that [the outside parties] did not to their knowledge attempt to influence [DCA's] decisions regarding its 1995 contract with MMI." Pl. Br. at 27. The President of MMI, Mr. Downey, acknowledged that there was no evidence that the Congressional staffers actually were able to exert any influence. Furthermore, there is no evidence that the decision makers

at DCA had personal animus against MMI, or that the Congressional staffers who claimed to have influenced DCA's decision actually did. Thus, even if plaintiff's allegations are true, they would be insufficient to meet the high burden to prove a breach of good faith and fair dealing. Defendant's motion to dismiss is therefore granted.

### CONCLUSION

For the reasons set out above, plaintiff's motion for partial summary judgment is granted. Defendant's cross-motion is granted in part and denied in part. Count III of plaintiff's complaint is dismissed. The parties are directed to file a joint status report no later than September 19, 2003, proposing a schedule for further proceedings.